JOHN F. LEMLER AND ELIZABETH G. LEMLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ELDENE A. SMITH AND JUNE R. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lemler v. Commissioner
Docket Nos. 918-77, 935-77.
United States Tax Court
T.C. Memo 1979-308; 1979 Tax Ct. Memo LEXIS 215; 38 T.C.M. (CCH) 1196; T.C.M. (RIA) 79308; August 13, 1979, Filed *215 Petitioners Lemler and Smith were a dentist and doctor, respectively, who enjoyed flying and were qualified as pilots. In 1970 they formed a subchapter S corporation, Elhon, to purchase a Bellanca aircraft which would be available for their personal use as well as for demonstrating the Bellanca to prospective purchasers. Elhon entered into an agreement with Bellanca Aircraft Co. wherein it agreed to use its own plane to demonstrate the Bellanca at its own cost in return for which it would receive a 5-percent commission on the sale of a Bellanca by the Bellanca company to one of Elhon's prospects. No such sales occurred. In 1973 Elhon bought a Piper Cherokee aircraft and used it to give flying instructions at the Asheville, N.C., airport. Elhon also investigated the possibility of opening a fixed-base operation at the airport but was unable to do so. Held: Elhon's demonstrator activity was a separate activity for purposes of section 183, I.R.C. 1954, and was not an activity engaged in for profit. Consequently, petitioners are not entitled to deduct on their personal returns for the years 1971-1975 the losses incurred by Elhon in conducting the demonstrator *216 activity. *217 Henry James, Jr., and James H. Abrams, Jr., for the petitioners. Gary F. Walker, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined the following deficiencies in petitioners' income taxes: Docket
No.
Petitioner
Year
Deficiency
918-77
John F. Lemler and
1971
$3,095.73
Elizabeth G. Lemler
1972
3,606.23
1973
5,391.67
1974
3,671.00
1975
1,684.00
935-77
Eldene A. Smith and
1971
2,027.44
June R. Smith
1972
2,646.28
1973
4,469.88
1974
2,706.92
1975
248.00
Due to concessions made by the parties, the only issue presented for our resolution is whether the activities in which Elhon Corporation, an electing subchapter S corporation pursuant to section 1371, et seq., I.R.C. 1954, [1] was engaged during the taxable years at issue *218 were carried on for profit. [2]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by reference. John F. Lemler and Elizabeth G. Lemler, petitioners *219 in docket No. 918-77, are husband and wife, whose legal residence at the time their petition was filed was Asheville, N. C. John Lemler was unmarried in 1971 and he filed his individual income tax return with the Internal Revenue Service Center in Memphis, Tenn. The Lemlers filed joint income tax returns for the years 1972 through 1975 with the Internal Revenue Service Center in Memphis. The Lemlers use the cash method of accounting. Eldene A. Smith and June R. Smith, petitioners in docket No. 935-77, are husband and wife, whose legal residence at the time their petition was filed was Candler, N.C. The Smiths, who use the cash method of accounting, filed their joint income tax returns for the years 1971 through 1975 with the Internal Revenue Service Center in Memphis, Tenn.[3]
Dr. Lemler, an oral surgeon, obtained a private pilot's license in 1959 and a commercial pilot's license in *220 1973. Dr. Smith, a medical doctor, obtained a private pilot's license in 1965 and a commercial pilot's license in 1968. A private license permits the holder to fly an airplane with passengers but does not permit the operation of an airplane for hire. For that purpose, a commercial license is necessary. Both men were highly enthusiastic about flying. Dr. Smith had been a shareholder of a corporation which had owned a Mooney aircraft for the pleasure use of its shareholders. Dr. Lemler had been a shareholder of a corporation which had owned a Cessna 182 aircraft for the pleasure use of its shareholders. Although they had known each other on a professional basis, they did not discover their mutual interest in flying until the Western North Carolina Pilots Association was formed in 1967 or 1968. Sometime during the late 1960's, Dr. Smith became familiar with the Bellanca Viking aircraft (hereinafter Bellanca). Dr. Lemler also had seen the Bellanca in 1969. In the spring of 1970 Dr. Smith responded to an advertisement concerning the Ambassador Program sponsored by Bellanca Sales Co. A doctor in California sent him some information on the Ambassador Program and apparently submitted *221 his name to the Bellanca Sales Co. because the doctors were contacted by their North Carolina representative after the doctors had purchased a Bellanca. The Ambassador Program is available only to those in the medical profession. As described by the Bellanca Sales Co., it is a program whereby owners of Bellancas demonstrate the aircraft to at least 30 propspective purchasers per year as a representative of a Bellanca dealer. An ambassador is not a salesman, but if a person to whom he has demonstrated the aircraft purchases one within 2 years of the demonstration, the ambassador receives a commission of 5 percent of the monetary transaction from the dealer making the sale. At a professional meeting, Dr. Smith told Dr. Lemler about the Ambassador Program with which Dr. Lemler already was familiar. Both men were interested in the aircraft and the program and decided to meet with Mr. Powers, a Bellanca dealer in Augusta, Ga. Dr. Smith felt that a market for aircraft existed in the Asheville area because no one in Asheville was actively engaged in selling aircraft. Dr. Lemler agreed to purchase the Bellanca with Dr. Smith because he was interested in establishing a fixed base operation *222 at the Asheville airport. See infra. For several months after deciding to purchase a Bellanca the doctors discussed the ramifications of the purchase. They met with an accountant and an attorney to discuss the set-up of the corporation they would need. Dr. Lemler particularly wanted a corporate structure because of the limited liability. However, the corporation, Elhon Corp. (hereinafter Elhon), was not legally formed until November 1970, see infra.
On July 20, 1970, the doctors purchased a single-engine, 4-passenger, 1970 Bellanca Super Viking, model 17-31a (hereinafter first Bellanca), at a cost of $35,000. The purchase price was attributable as follows: $24,000 by a personal check from Dr. Lemler and $11,000 from a trade-in of the Mooney airplane owned by Dr. Smith. Dr. Lemler was reimbursed his $24,000 by a check drawn on Elhon's account at the Northwestern Bank. A check drawn on Elhon's account also paid the remaining balance due on the Mooney airplane. In November 1972 the first Bellanca was traded in as part of the purchase price for a 1973 Bellanca Turbo Viking, model 17-31ATC, also a single-engine, 4-passenger aircraft (hereinafter the second Bellanca), which *223 cost $53,373.13. The second Bellanca was not actually acquired until February 1973, so Elhon was without an aircraft to demonstrate for approximately 3 months. [4]
On August 31, 1970, Dr. Lemler, as secretary of Elhon, signed a "Bellanca Ambassador Agreement," with Bellanca Sales Co. The agreement provides in relevant part: BELLANCA AMBASSADOR AGREEMENT
The under signed ELHON CORPORATION hereinafter called First Party, is the owner of a Bellanca aircraft manufactured by Bellanca Aircraft Corporation of Alexandria, Minnesota. BELLANCA SALES COMPANY, hereinafter called Second Party, is the Dealer for Bellanca Aircraft Corporation and the parties hereto desire to contract under the terms hereof for the promotion and sale of all models of Bellanca aircraft. 1. Using his own Bellanca aircraft, First party agrees to demonstrate the flying characteristics of Bellanca aircraft and the convenience and practical aspects of travel by private aircraft to such person [sic] as First Party believes may be prospects for the purchase of Bellanca aircraft through Bellanca Sales Company. 2. All *224 such demonstrations shall be carried out at First Party's sole cost and expense and to such persons as First Party may select and First Party shall be deemed to be an independent contractor * * *. 3. After each demonstration First Party shall fill out Bellanca Sales Company form BSC1210, which form shall be signed by the prospect for whose benefit the demonstration was carried out and the original of such form shall be kept by First Party and the copy thereof promptly delivered to BELLANCA SALES COMPANY. Upon any sale by second party of a Bellanca aircraft to a prospect to whom demonstration of said aircraft was made by First Party, second party will pay to First Party the sum of money equal to five per cent of the purchase money for said aircraft received by second party. If payment for such aircraft be part by tradein of another aircraft and part by cash, said five per cent shall be paid only on the cash portion of the transaction. * * * 4. * * * First Party will furnish second Party with the names and addresses of at least thirty prospects annually duly entered and signed on Bellanca Sales Company form BSC1210. * * *
7. First Party shall be entitled to payment *225 hereunder only if the completed sale and payment of the purchase price occurs within two years after Second Party first received completed form BSC1210 covering the prospect in question. Second Party shall never be under any obligation to follow up on any prospect after First Party's demonstration and further sales efforts by Second Party shall only be those as appear justified in Second Party's sole judgment and discretion.
Prior to November 27, 1970 (the date Elhon's articles of incorporation were filed), the first Bellanca was insured in the name of Elhon; billing statements, stationery and envelopes were ordered and printed in the name of Elhon; the sales kit for the sale of Bellanca airplanes was purchased from Bellanca Sales Company in the name of Elhon; oil company credit cards were obtained in the name of Elhon; bills were rendered for repairs on the first Bellanca to Elhon; and a checking account was opened in Elhon's name. The first Bellanca was insured for pleasure and business use including the transportation of executives, employees, guests, and customers. The second Bellanca was insured for pleasure and business use including transportation of persons for sales *226 demonstration. On November 27, 1970, the articles of incorporation of Elhon were filed with the secretary of state of North Carolina. The organizational meeting was held on January 4, 1971. On January 6, 1971, Elhon elected for Federal income tax purposes to be taxed as a subchapter S corporation pursuant to sections 1371 et seq. Dr. Lemler and Dr. and Mrs. Smith were the original shareholders. [5] Elhon's office was located at Dr. Lemler's business office. The articles of incorporation state that the purposes of incorporating Elhon were: (a) To engage in the purchase, sale, leasing and/or sub-leasing of any and all types and kinds of airplanes, aircraft, boats, accessories and equipment * * *. (b) To engage in the business of purchasing, * * * leasing, selling, * * * generally dealing in, repairing, renovating and servicing all types of new and used airplanes, aircraft, boats, *227 automobiles, trucks and other motor vehicles * * *. (c) To * * * manufacture * * * airplanes, aircraft, boats, automobiles, vehicles, trucks, tractors, trailers and machinery * * *. plus a number of boiler plate purpose clauses which permitted the corporation to do almost anything that was legal.
On its income tax return for 1971, Elhon listed its business as "Leasing, Sales Comm." On its returns for 1972 through 1975, Elhon listed its business as "Airplane Leasing and Sales." On October 4, 1970, Dr. Lemler attended a 2-day sales meeting held by Bellanca Aircraft Co. in Minnesota for Bellanca dealers and ambassadors. At that meeting Dr. Lemler heard of an ambassador who had been responsible for six aircraft sales in 1 year. This report led him to believe that he and Dr. Smith would have no trouble instrumenting at least one sale per year. Dr. Smith knew of an ambassador in Texas who had been responsible for three Bellancas in 1 year.Dr. Smith believed that the Bellanca factory was selling 300 to 400 Bellancas per year during 1971 through 1973 and that Carolina Bellanca was selling approximately 12 Bellancas per year. From 1973 through 1975 the records of the Bellanca Sales *228 Co. indicate the following sales: Bellanca Sales Co.
Ambassadors
Ambassadors
(new aircraft)
(new aircraft)
(used aircraft)
1973
100
9
22
1974
58
7
11
1975
37
5
16
The gross commission to Elhon pursuant to the ambassador agreement if it was responsible for the sale of an aircraft of the first Bellanca model for cash without a trade-in would have been approximately $2,000.
Both doctors made demonstration flights, although Dr. Lemler did not make as many as Dr. Smith. After a demonstration flight (which could be either local or cross-country) was made, the prospective purchaser was shown brochures containing information about the prices of the aircraft with different options and the available color schemes and decor.After the demonstration the prospective purchaser would fill out a comment slip, copies of which were sent to Bellanca dealers for followthrough with the prospective purchaser. The Bellanca was not the type of plane that would usually be purchased by someone as his first aircraft. Elhon did not advertise that it was engaged in the Ambassador Program because they did not want to give demonstrations to people who merely wanted *229 a free ride in the Bellanca. The availability of demonstration flights was made known through word of mouth and through contact with other pilots in the area. Elhon did not list a telephone number in either the white or yellow pages because Dr. Lemler did not want his office to be called.
Of the total flight hours in the Bellancas the percentage of the time the aircraft was used for demonstrations during the taxable years at issue was as follows: Total
Demonstration
hours
hours
Percentage
1971
274.7
78.2
28
1972
254.7
56.7
22
1973
219.9
37.3
17
1974
110.8
3.4
3
1975
59.0
.6
1
The number of demonstration flights given by the doctors during the taxable years at issue was as follows: [6]
Dr. Smith
Dr. Lemler
1971
12
5
1972
14
1
1973
15
6
1974
2
0
1975
0
1
The remaining flight hours are attributable to maintenance and proficiency flights and to the personal use of the Bellancas by Dr. Smith and Dr. Lemler. Both Dr. Smith and Dr. Lemler paid an hourly fee which ranged from *230 $10 per hour to $18 per hour during the taxable years at issue to Elhon for every hour of flying time incurred by them other than that incurred for maintenance. Petitioners explained that this was done because Elhon could not afford the costs and in order to give the doctors personal flying time. The amounts received by Elhon under this arrangement were as follows: 1971
$2,172.00
1972
3,891.00
1973
4,634.00
1974
2,127.00
1975
641.20
In 1973 Elhon also received rental payments from third parties of $1,654 which represent three separate leases of the second Bellanca. During the taxable years at issue, Dr. Smith and Dr. Lemler made monthly loans to Elhon in order that Elhon could pay its operating expenses and the payments on the notes which financed the airplanes. The loans to Elhon were officially exchanged for Elhon's stock at various times during the taxable years at issue. The total amount loaned to Elhon by Dr. Smith and Dr. Lemler from 1971 through 1975 was $62,975.72. The demonstration flights were either local or cross-country. The long-distance flights demonstrated the advantage of rapid flight to a potential customer who would be interested *231 in getting away for a week or a weekend. Of the long-distance flights, Dr. Smith made a 6-day trip with a nonpilot from Asheville to West Palm Beach, to the Bahamas, to Freeport, and then back to Asheville. On another demonstration with the same nonpilots, Dr. Smith made a 4-day trip to New Orleans and back. On another demonstration flight, Dr. Smith, who planned to attend an aircraft-owner and pilot association meeting in Opa-Locka, Fla., flew a friend and his wife to Melbourne, Fla., where they had relatives, and then flew on to the meeting. Dr. Smith also took this same friend on a demonstration flight to Kenora, Ontario, Canada, for a fishing trip. Dr. Smith made another demonstration flight from Palm Beach to the Bahamas with a commercially licensed pilot. He also made a demonstration flight to Bangor, Me., and New Castle, Ind. Dr. Lemler made a demonstration flight to Greensboro, S.C., and back. He made a demonstration flight in Foley, Ala., also the home of his parents. Elhon did not earn any commission income as a result of the demonstration flights with the Bellancas. On February 16, 1973, at about the time the second Bellanca was purchased from Carolina Bellanca, *232 Elhon entered into a Bellanca Sub-Dealer Agreement with Carolina Bellanca. This agreement was somewhat similar to the Ambassador agreement in that Elhon agreed to demonstrate the Bellanca aircraft, as an independent contractor, using its own aircraft and at its own cost, in return for which it was entitled to purchase all demonstrator aircraft at a discount of 15 percent of list price and was entitled to the entire profit above list price less 15 percent from the sale of its own demonstrator aircraft. [7] Elhon did not sell any aircraft under this agreement except the second Bellanca which was sold in 1976. In late 1972 and early 1973 Elhon investigated the possibility of subdealer arrangements with dealers of lower-priced aircraft and the possibility of establishing a flying school with that aircraft. Dr. Smith asked William Norwood if he would be interested in instructing for Elhon and also explained Elhon's hopes with regard to a fixed-base operation. Norwood was interested. In the meantime, an agreement was reached with Great Smoky Mountain Aviation, *233 Inc. (hereinafter Great Smoky), a Piper aircraft dealer, whereby Elhon could purchase an aircraft at 5 percent above dealer cost and retain any profit made on a sale. On April 11, 1973, Elhon did purchase a Piper Cherokee, model 140 aircraft (hereinafter First Cherokee) for $20,700 from Great Smoky, but the subdealer arrangement was not implemented because of the death of the president of Great Smoky. The first Piper was used for flight instruction by Norwood [8] from April 1973 until it was sold in June 1975 for $13,000. A loss of $1,908 on that sale was claimed on Elhon Corporation's 1975 return, computed as follows: Cost
$ (20,740)
Less: Depreciation
5,832
Sales price
13,000
Loss
$ (1,908)
The flying school was established to enhance Elhon's aviation activities and as the first step toward establishment of a fixed-base operation. On March 28, 1974, Elhon purchased another Piper Cherokee, model #180 (hereinafter second Cherokee) from Orrco Corp. for $20,000. This aircraft also was used by the flight school. The second Cherokee was sold on September 27, 1974, for $22,044 to Arthur Morris, *234 Jr. The $3,294 gain on the sale was reported on Elhon's 1974 return as follows: Cost
$ (20,000)
Less: Depreciation
1,250
Sales price
22,044 $ 3,294
During the period from May of 1973 through June of 1975, Elhon Corporation recorded gross receipts from its flight instruction school in the following amounts: May through December 1973
$ 4,659.00
Taxable year 1974
11,282.00
January through June 1975
2,415.67
In the beginning of this activity Elhon charged the students a fee for lessons and paid Norwood an instructor's fee or salary. Later Norwood simply paid Elhon rental for the use of the airplanes and collected his own instruction fees. The flight school was discontinued in May 1975 because the maintenance expenses were excessive when compared to revenues and because Elhon had been unable to establish a fixed-base operation or to obtain the necessary approval from the City of Asheville to conduct the school, see infra.
A fixed-base operation essentially is a service station for aircraft. Fuel, maintenance work, and hangar facilities are provided and other services such as navigational and radio equipment maintenance, flight *235 instruction, charter services, and aircraft leasing and sales may be provided. A fixed-base facility, A & H Flying Service, was operating at the Asheville airport during the taxable years at issue. However, Dr. Lemler believed that a second fixed base operation at the airport was feasible because of the general dissatisfaction among pilots in the Asheville area with the facilities and services provided by A & H Flying Service. The land upon which the Asheville airport is located is owned by the City of Asheville. In order to conduct any commercial activities at the Asheville airport a lease, contract, or permit approved by the Council of the City of Asheville must be obtained. Sometime in 1973 Elhon contacted representatives of Exxon concerning its AVITAT program under which Exxon provided fixed-base operation facilities. Although there was some exchange of correspondence, Exxon became disinterested in pursuing the matter because of the fuel shortage. At about this same time, Dr. Smith approached the American Enka Corp. for a service commitment with regard to its aircraft in order to enhance Elhon's chances with Exxon. American Enka's commitment was dependent, however, *236 upon Elhon's entering into an agreement with Exxon. In March 1973 Dr. Lemler contacted David Fortner, an avionics repairman, about the possibility of operating an avionics shop at the Asheville Airport. On July 26, 1973, Elhon, which had not previously made application to the City of Asheville for permission to conduct commercial activities at the Asheville airport, received a letter from U. Gary Taylor, the Director of Aviation of the City of Asheville, which states: It has been brought to my attention that persons owning aircraft based at the Asheville Airport Fixed Base Operation are leasing or renting the same to produce revenue. Also, they are providing instructor's services. In compliance with Rules and Regulations governing the Asheville Airport, Ordinance No. 670, Article 1, Section 5, Commercial activity states: a. No persons shall utilize any portion of the Asheville Municipal Airport, or any structure thereon, for revenue producing commercial activities except under the terms of a lease, contract, or permit approved by the Council of the City of Asheville. This letter is directed to your attention in hopes that you will comply with Ordinance No. 670 and help *237 maintain a smoother operation at the Asheville Airport. Your cooperation will be appreciated, and if you have questions, please call or write. On August 3, 1973, in response to this letter, Dr. Lemler wrote to the City Manager of the City of Asheville. requesting a permit to maintain an airplane for training purposes at Asheville Municipal Airport and a lease of space on the grounds of the airport to construct a building for radio maintenance and sales. Elhon did not receive a reply to this letter and Dr. Lemler did not follow up with this letter because Norwood had discussed it with the City of Asheville and was informed that no action would be taken upon it. During the taxable years at issue petitioners' gross income without reference to their respective shares of Elhon's losses were as follows: Dr. Lemler
Dr. Smith
1971
$61,662.04
$ 48,956.07
1972
73,656.00
46,667.03
1973
60,350.00
50,996.50
1974
59,121.00
49,487.00
1975
75,954.00
50,836.00
During the years 1971 through 1973, Elhon Corp. incurred operating expenses for the Bellanca plane as follows: Direct and Variable Costs of Bellanca Airplane: 1971
1972
1973
Total
Gasoline & Oil
$1,833
$2,204
$2,553
$6,590
Repairs & Maintenance
2,093
1,953
1,344
5,390
Insurance
968
685
1,018
2,671
Interest
2,187
5,062
2,457
9,706
Depreciation
4,326
5,719
4,448
14,493
Total Direct
and Variable
$11,407
$15,623
$11,820
$38,850
*238 The above schedule does not include certain fixed costs, such as hangar rent expense, taxes, and other expenses. The following schedule reflects the losses reported by Elhon on its returns for the taxable years 1971 through 1975 and the extent to which petitioners claimed those losses on their respective returns. 1971
1972
1973
1974
1975
Elhon
$10,492.03
$12,540.13
$9,029.53
$16,239.00
$ 16,159.00
Lemler
5,246.01
6,270.00
4,515.00
7,000.00
6,718.00
Smith
5,246.02
6,270.06
4,514.77
6,999.00
7,083.00
Unclaimed $0 $ .07 $ .24
$ 2,240.00
$ 2,358.00
Respondent disallowed the losses claimed by Dr. Lmeler and Dr. Smith for the years 1971 through 1974, but allowed deductions in the amounts of $185.15 and $680.85 claimed in 1971 and 1972 and attributable to Elhon's interest and taxes for those years. Dr. Smith's 1971 deduction of $185.15, however, was reduced to $25.15 to reflect the disallowance of a separate unsubstantiated deduction of $160 claimed by Dr. Smith. For 1975, respondent offset Dr. Lemler's and Dr. Smith's allowable deduction of $1,976 against their claimed losses of $6,718 and $7,083, respectively, resulting *239 in net disallowances of $4,742 and $5,107, respectively. OPINION Petitioners, Drs. Lemler and Smith, each owned 50 percent of the stock of Elhon, a subchapter S corporation formed in 1970 and deactivated in 1975. Elhon suffered losses in each of the years 1971-75 and petitioners claimed their share of the losses on their personal returns for those years. Sec. 1374, I.R.C. 1954. [9] Petitioners also claimed their prorata shares of an investment credit claimed by Elhon on its 1973 return.Respondent disallowed the deductions on the grounds that Elhon was not engaged in a trade or business or in a transaction entered into for profit during the years involved and therefore the losses and the investment credit of Elhon were not deductible by petitioners under section 183. Section 183(a) provides, in pertinent part, that in case of an activity engaged in by an electing small business corporation, if such activity is not engaged in for profit, no deduction attributable *240 to such activity shall be allowed except as provided in this section. The allowable deductions are set forth in 183(b), being deductions allowable regardless of whether the activity is engaged in for profit (such as taxes, interest, etc.), and deductions allowable if the activity were engaged in for profit but limited to the gross income derived from such activity, reduced by the deductions allowed under section 183(b)(1). Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or paragraphs (1) and (2) of section 212. Thus, to avoid being an activity not engaged in for profit, the activity must constitute the carrying on of a trade or business, sec. 162, or an activity engaged in for the production of income or the management, etc. of property held for the production of income, sec. 212. The basic question is whether the activities of Elhon were activities engaged in for profit. A threshold question, however, involves the relationship between the activities carried on by Elhon during the taxable years at issue. Elhon engaged in two activities--demonstrating the Bellancas *241 from 1971 through 1975 and conducting the flying school from the spring of 1973 through the spring of 1975. In his briefs, respondent has conceded that the flying school was a trade or business but continues to argue that the Bellanca demonstrations were not. This bifurcation of activities is permissible, sec. 1.183-1(d)(1), Income Tax Regs., [10] but petitioners strenuously challenge its application to this case on the ground that the bifurcation is artificial and unsupported by the record. It is their position that Elhon's overall business purpose during 1971 through 1975 was the establishment of a full-scale aviation business of which demonstration and instruction were integral parts. Petitioners argue that Elhon maintained one set of books and records for the Bellanca demonstrations and the flying school and that Elhon's long-range objective was the establishment of a fixed-base operation at the Asheville airport. They also argue in support of amalgamating the activities that the flying school students comprised a potential market for the Bellancas and that possible purchasers of the Bellancas might be in need of professional instruction. *242 However, acceptance of petitioners' position with regard to Elhon's business purpose requires a cohesion and sense of planning which we do not believe evident from the record. Undoubtedly, Dr. Lemler was interested in the establishment of a second fixed-base operation at the Asheville airport. However, the minimal and diffused efforts made to investigate the opportunity support an inference that the fixed-base operation was more a vague or undefined topic of interest than an eventual and fixed goal of Elhon's. In fact it was not until late 1972 and early 1973 that Elhon actually began to take steps toward establishing the type of endeavors which are associated with a fixed-base operation. It was then that the first Cherokee was acquired and Norwood was hired to conduct the flying school. It was then that discussions were held with the AVITAT representatives and that an avionics mechanic and a general mechanic were approached. However, the significance of these actions is seriously diluted given the almost total absence of investigation into the legal prerequisites to commercial activity at the airport or of any serious or meaningful attempts to negotiate with the city council *243 for appropriate permission to conduct commercial activity. Apparently the city council was adverse to the idea of a second fixed-base operation so that any negotiations would have been futile. However, the well known disinclination of the city council to entertain proposals for additional commercial aviation services and facilities underscores our impression that the idea of eventually establishing a fixed-base operation had by no means attained the level of business purpose or goal. It merely was an unformulated possibility which neither petitioner nor Elhon actively pursued until 1973 and even then in such a tepid and inconclusive fashion as to cast doubt on the strength of the interest and commitment. Moreover, we fail to see the correlation between demonstrating the Bellancas and the flying school. Petitioners were both qualified as pilots and liked to fly. Undoubtedly this propensity was largely responsible for their acquisition of the first Bellanca in 1970. The first Bellanca had been traded in for the second one before the flying school was established and the second Bellanca was not used for instruction purposes. The second Bellanca was a very sophisticated and expensive *244 aircraft when compared to the Cherokees used for flight instruction and would not usually be an aircraft desired by a novice pilot. And it does not appear to us that the flying school was intended in part to assist the sale of Bellancas. Rather, it is more likely that the flying school was started to recoup or at least compensate for the fact that petitioners had expended a substantial amount of monies in order to purchase and to fly the Bellancas which they clearly were not going to recoup through the Bellanca demonstrations. Finally, even if we were to accept the premise that Elhon's business purpose was the establishment of a fixed-base operation, we are not persuaded that the Bellanca demonstration activity was intended to or actually would have furthered that goal. As we understand the terms of the Ambassador Program and the subdealer agreement, petitioners merely flew potentially prospecitve customers around in the aircraft and forwarded their names either to the Bellanca Sales Corp. or to Carolina-Bellanca. Elhon was not in the position to sell the aircraft on behalf of the Bellanca Sales Corp. or its dealers and made no effort to enter into such an arrangement. Neither *245 program had any aspects of a fixed-base operation as it was described to us, i.e., a service station for aircraft. Demonstrating the Bellancas would not have been related to the operation of, nor needed to promote, a fixed base operation, even if its establishment had been feasible. We conclude that Elhon's demonstrator activity should be separated from its other activities for purposes of section 183. Our conclusion that the severance of the Bellanca demonstrations and the flying school is justified by the record brings us to the question of whether the Bellanca demonstrations alone were carried on for profit within the meaning of section 183(c), supra.This determination is one of fact and hinges upon whether an objective view of the particular facts and circumstances reveal a bona fide intention and expectation of realizing profit from the demonstrations regardless of the reasonableness of that expectation. Sec. 1.183-2(a), Income Tax Regs.; Jasionwski v. Commissioner,66 T.C. 312, 321 (1976). Section 1.183-2(b), Income Tax Regs. *246 , sets forth some of the relevant factors, derived principally from prior case law, which are to be considered in determining whether an activity is engaged in for profit. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Although no one factor is determinative of the taxpayer's intention to make profit ( sec. 1.183-2(b), Income Tax Regs.), a record of substantial losses over many years and the unlikelihood of achiieving a profitable operation are important factors bearing on the taxpayer's true *247 intention. Sec. 1.183-2(b)(6), Income Tax Regs.; Jasionowski v. Commissioner,supra at 322; Golanty v. Commissioner, 72 T.C.     (1979). As this Court stated in Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967): [The] presence of losses in the formative years of a business * * * is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years. With this guidance we are persuaded by the record that the Bellanca demonstrations were not an activity carried on for profit. An analysis of the facts and circumstances supra, does not reveal a bona fide profit-making intent. To petitioners, both avid pilots of long standing, the attraction of an arrangement like the Ambassador Program and the subdealer arrangement with Carolina-Bellanca *248 is self-evident. The Ambassador Program and the subdealer arrangement smack of a sales gimmick in which nobody loses; the Bellanca company sells an aircraft (i.e., the demonstrator), bears none of the expenses of demonstration, and if a purchase through operation of the programs occurs, cedes a relatively minimal amount of the gross profit to the ambassador or subdealer. The ambassador or subdealer owns an aircraft and may with minimal effort convert a portion of his flying time into a business arrangement or, as appears to have happened here on several occasions, combine the business framework with a personal flight. The result is the possibility of earning commissions if a sale occurs and deducting expenses of maintaining and operating an aircraft which undoubtedly would have been owned and operated in any event. In this context, we note that petitioners' respective incomes during the taxable years at issue were substantial and more than sufficient to absorb the losses generated by the Bellanca demonstrations. Cf. Golanty v. Commissioner,supra; sec. 1.183-2(b)(8), Income Tax Regs.
When petitioners bought the first Bellanca and Elhon entered *249 into the Ambassador Program there was no prospect that this activity alone would be profitable. Petitioners did not expect credited sales to exceed one or two planes a year, and the commissions on such sales would not have come close to covering the cost of the plane and of operating it, even without taking into consideration compensation for their time. Under the program they were supposed to demonstrate the plane to a minimum of 30 prospects a year. Petitioners flew between 15 and 21 demonstration flights a year in 1971, 1972, and 1973, but flew only 2 such flights in 1974 and one such flight in 1975. Under the Carolina-Bellanca agreement Elhon received income only if one of Elhon's prospects bought a Bellanca for more than the list price, which none of them did. However, it did permit Elhon to purchase a Bellanca at a discount. The Bellancas were used far more frequently by petitioners for practice flying, flights to medical meetings, and for pleasure trips then for demonstration purposes. Even if the practice flights and flights to medical meetings were related to petitioners' medical and dental businesses, that was not the business of Elhon. Elhon did not advertise its *250 activity and did not even have a telephone listed in its name in the telephone directory. While leasing the plane to outsiders might have produced additional income, with the exception of $1,654 earned in 1973 from three leasings by a third party, all of the lease income represents amounts paid to Elhon by petitioners for all flying time incurred by them, including demonstration flights, except maintenance flights. Petitioners paid rent to Elhon to help it meet its operating expenses and bills. Moreover, petitioners made additional contributions to the capital of Elhon from time to time to provide it with necessary cash. While the prerequisite profit motive to qualify as a trade or business need not be reasonable, it must be genuine and bona fide as determined from an objective rather than a subjective approach. See Bessenyey v. Commissioner,supra.Under the facts and circumstances present in this case we cannot find that a bona fide intent to make a profit existed. In fact we do not understand petitioners to contend that they expected to make a profit from the demonstrating *251 activity alone. Only if it was a part of a fixed base operation did they expect to make a profit from the entire operation. But petitioners could have surmised from the beginning that a fixed base operation at the Asheville airport was not feasible. And furthermore the term "trade or business" presupposes an existing trade or business, Downs v. Commissioner,49 T.C. 533 (1968), American Properties, Inc. v. Commissioner,28 T.C. 1100 (1957), affd. 262 F.2d 150 (9th Cir. 1958), and Elhon never engaged in a fixed-base operation. In support of their contention that the Bellanca demonstrations constituted a business, petitioners point to the facts that Elhon maintained books and records reflecting the income and expenditures of that activity and that the Bellancas were insured for commercial use. While commendable and indicative of commonsense, we do not see what these facts prove one way or the other insofar as the expectation of profit is concerned. See Bolt v. Commissioner,50 T.C. 1007 (1968). To reiterate, we believe the record in this case reveals that respondent's determination that the Bellanca demonstration *252 activity carried on by Elhon during the taxable years at issue was not an activity carried on for profit within the meaning of section 183 was correct. Because of respondent's concession that the flying school was a trade or business and because of concessions by the parties with regard to other adjustments, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue, unless otherwise specified. ↩
2. These concessions will require that our decision be entered under Rule 155, Tax Court Rules of Practice and Procedure.↩
3. June R. Smith owned one share of Elhon Corporation, see infra.↩ Aside from this connection with the case, she and Elizabeth G. Lemler are petitioners herein merely because joint returns were filed. Therefore, references to petitioners hereafter will be to Dr. Lemler and Dr. Smith.
4. The second Bellanca was sold by Elhon for $42,000 on Oct. 14, 1976.↩
5. June Smith was issued one share because the doctors were informed by counsel that three shareholders were required by the provisions of sec. 1371, et seq.↩ She never actively engaged in the management of the corporation. Drs. Smith and Lemler were the only stockholders active in Elhon.
6. These figures reflect the number of demonstration flights but do not include the number of passengers per flight.↩
7. This agreement did not provide for a commission on the sale of a Bellanca by Carolina Bellanca to one of Elhon's prospects.↩
8. At some time Elhon also employed another instructor.↩
9. No issue has been raised regarding the limitation on losses provided in sec. 1374(c)(2)↩.
10. Sec. 1.183-1(d), Income Tax Regs., provides that where a taxpayer is engaged in several undertakings, each may be a separate activity, or several activities may constitute one activity, depending on all the facts and circumstances. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities.However, the taxpayer's characterization will not be accepted when it appears that it is artificial and cannot reasonably be supported under the facts and circumstances of the case. If the taxpayer engages in two or more activities, deductions and income from each separate activity are not aggregated in determining whether a particular activity is engaged in for profit or in applying sec. 183↩.