LINCOLN ADOLPHUS BOLT, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3863-67, 5261-67.    Filed September 30, 1968.

Lincoln Adolphus Bolt, pro se.
*S. W. Simpson*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's income tax for the calendar years 1964 and 1965 in the respective amounts of $1,069.00 and $717.75. One of the issues raised by the pleadings has been conceded by petitioner leaving for our decision the question of whether petitioner is entitled to deduct as ordinary and necessary expenses of carrying on a trade or business amounts which he expended in each of the years 1964 and 1965 in connection with automobile-racing activities.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner resided in Los Angeles, Calif., at the time of filing his petitions in this case. His individual income tax returns for the calendar years 1964 and 1965 were prepared on the cash basis of accounting and were filed with the district director of internal revenue at Los Angeles.

Petitioner graduated from college with a degree in electrical engineering in July 1959. Shortly thereafter he became employed on a full-time basis as an electronics engineer by North American Aviation, Inc. (now North American Rockwell Corp.), and from that time has been continuously so employed to the date of the trial of this case. During the years 1964 and 1965 petitioner on occasions did overtime work for North American Aviation, Inc.

Petitioner was 27 years old in 1959. Prior to 1959 he had never operated or driven any type of a motor vehicle. During 1959, petitioner taught himself how to drive an automobile and acquired a driver's license.

Sometime in 1960, petitioner with the idea that he might be interested in automobile racing, bought books and magazines dealing with the subject. He learned from these sources that there were a number of different types of racing cars and decided that the most likely car for him to consider was a "midget," taking his financial status into consideration. Petitioner purchased his first racer, a midget, in 1960 for $125. The car never ran. He sold it in March 1961 for $25. After going into the racing field petitioner discovered that it was difficult to obtain technical, professional information in detail on the subject. He was able to persuade a friend to let him ride in a race car which the friend owned prior to buying a second midget racer.

Petitioner owned or had an interest in the following racers:

(1) A midget racer which he acquired in March 1961 for $600.

(2) A sprint car which he bought in 1962, used certain of its parts, and then resold for the same amount he had paid for the car.

(3) A sprint car which he acquired in 1965 and wrecked in 1966.

(4) A Chrysler engine which petitioner owned was put into a sprint car owned by a man named Orange Taylor under some agreement with respect to petitioner's being permitted to drive the car. This car was "demolished" at Ascot Park Speedway in November 1965.

(5) Petitioner owned a midget jointly with a man named Smart. This car was lost when Smart's wife sold everything in his garage, including the racer, to a junkman.

Petitioner got mechanical assistance to put the midget which he acquired in 1961 for $600 in condition to race and ran this car for the first time in 1962 and crashed it. After rebuilding the car, petitioner took it out for practice and the engine "blew." Petitioner had a new Chevy II engine installed in the car, but had difficulty in getting the engine to work properly. Petitioner met a new mechanic by the name of Henderson in 1964. Henderson was able to make the engine work properly and petitioner raced this car regularly in 1964 and 1965. Petitioner owned this car until 1967 when he wrecked it.

After petitioner acquired his first midget racer he began to spend most of his weekends and free evening hours working on his car. Petitioner was not a mechanic and he sought the assistance of people who were. At first, his friend Orange Taylor, who owned his own race car, worked with petitioner. Taylor was too busy on his own car to give petitioner all the assistance he needed, so petitioner got the assistance of a professional mechanic who worked on the 1961 midget until the early part of 1964 when Henderson began doing the mechanical work on petitioner's car. Petitioner drove the 1961 midget in one race in 1962 and thereafter continued to drive it in races through 1967.

Petitioner, from the time he bought his first midget in 1960 throughout the years here in issue and subsequent years, acquired mechanical experience by working with other mechanics on his own car and, also, by working with Orange Taylor's pit crew. On April 18, 1962, a picture taken shortly before that date at a California racetrack showing a race car and Orange Taylor, his driver Don Johns, and two crew members, one of whom was petitioner, was published in a paper entitled, "National Speed Sport News." The caption of the picture was "Colored Team on Way Up" and the statement beneath the picture included the following: "The Taylor team, one of CRA's finest, is the first colored team to join the organization since its incorporation in 1946."

During the time petitioner was attending college and for several years thereafter he shared a room or apartment with William Smith. During the early 1960's petitioner began to have the apartment he shared with Smith cluttered with racing-car parts and racing magazines and books. Previous friends of petitioner's visited the apartment less frequently than in prior years since petitioner devoted all of his weekend time when he was not at his employment with North American Aviation, Inc., and many of his evenings, to work on his racing car or going to races. During the years 1962 through 1966 Smith questioned petitioner on a number of occasions as to why he spent so much of his time and money in connection with race cars. Petitioner would tell Smith that he was engaging in these activities to make a profit, that he envied the drivers who were driving for owners for money, and that he wanted eventually to be able to reach this point.

Petitioner drove for other owners only two or three times during the years 1960 through 1966. Petitioner drove the car owned by Taylor in which his Chrysler engine was installed on several occasions before he and Taylor had a disagreement. Their disagreement arose when Taylor asked petitioner to run the car behind the pack and not risk an accident and petitioner told Taylor that he was in there to race and not to practice and that he would not follow the pack. Petitioner drove the car in a race at Ascot Park Speedway in November 1965 in which it was "demolished."

Petitioner joined the United Racing Association (URA) in 1961. The URA went defunct in 1964 or 1965 after a lawsuit was brought against it claiming a large amount of money. Petitioner was a member of the California Racing Association (CRA) in 1964 and 1965. Petitioner drove in races sponsored by the United States Auto Club (or the United States Racing Club) (USAC) in 1964 and 1965 but he did not join that organization until 1967. He did not join USAC in 1964 and 1965 because of the restriction placed by the organization on its driver members racing in local races. Since he was permitted to drive in USAC races without being a member, he was unwilling to accept the limitations of membership during the years here in issue.

These various racing clubs held races in and around southern California. USAC held about 30 races in southern California in both 1964 and 1965 and CRA held about 40 in each of those years. Each of these associations had regulations governing the specifications, mechanical fitness, and appearance of cars which would be permitted to enter the races. The track stewards at each race passed upon the fitness of a car to enter a race and upon the fitness of the driver of the car to drive. A physical examination of a driver might be required before the driver could enter a race. A new driver at any particular track was required by the track steward to demonstrate his driving ability before he was permitted to enter a race. By 1962 petitioner was able to qualify as a driver at the various racetracks.

Petitioner never took part in a race which did not have a "purse." The purse is the amount of money available for prizes in the race. Typically the purse would be a guaranteed amount or a certain percentage of the gate receipts if more than the guaranteed amount. Sometimes, the purse would be a flat guarantee with no increase because of gate receipts.

A racing event is broken down into several parts. First, there is the warming up; then there is qualifying; next there are the various heat races; then the semimain event; and, finally, the main event. The total purse would generally be divided among the various events as follows:

| Event | Percent of total purse |
| --- | --- |
| Main event | 62.75 |
| Semimain event | 21.50 |
| Heat races | 13.50 |
| Qualifying | 2.25 |
| | 100.00 |

In each one of the events, the prize money would be further subdivided to persons coming in first, second, third, etc. Accordingly at a typical USAC race in 1964 or 1965, the prize money for the main event would

be $1,500 and the person coming in first would win 25 percent of it, or $375; the person coming in second would win 15 percent of it, or $169, etc. At a typical CRA race, with a purse of $2,000 for the main event, the person coming in first would win 14 percent, or $280; the person coming in second would win 9 percent, or $155, etc. In some of the heat races, everybody who ran and finished the heat would win some amount, perhaps as little as $5 or $6.

Petitioner calculated that if he ran in a specified number of main events a year and placed first through fifth in a certain number of them he would realize as winnings the amounts indicated in the following schedule:

| Number of races run | First place | Second place | Third place | Fourth place | Fifth place |
|---|---|---|---|---|---|
| | USAC ($1,500 purse per race) | | | | |
| 30 | $11,250.00 | $5,070.00 | $2,868.00 | $1,875.00 | $1,500.00 |
| 20 | 7,500.00 | 3,380.00 | 1,912.00 | 1,350.00 | 1,000.00 |
| 15 | 5,625.00 | 2,535.00 | 1,434.00 | 937.50 | 750.00 |
| 10 | 3,750.00 | 1,690.00 | 956.00 | 625.00 | 500.00 |
| 5 | 1,875.00 | 845.00 | 478.00 | 312.50 | 250.00 |
| | CRA ($2,000 purse per race) | | | | |
| 30 | 8,400.00 | 4,650.00 | 3,300.00 | 2,400.00 | 2,062.50 |
| 20 | 5,600.00 | 3,100.00 | 2,200.00 | 1,600.00 | 1,375.00 |
| 10 | 2,800.00 | 1,550.00 | 1,100.00 | 800.00 | 687.50 |
| 5 | 1,400.00 | 775.00 | 550.00 | 400.00 | 343.75 |

Petitioner could have won smaller amounts if he placed in an event other than the main event, such as the semimain event or a heat race.

Petitioner's participated in about 15 races in each of the years 1964 and 1965. In one of the races petitioner entered in 1965 he competed against well-known race car drivers including Parnelli Jones, who had been a winner of the Indianapolis 500 race which is the best known of the automobile races and has the largest purse. He ran in main events once or twice in each of the years 1964 and 1965. Petitioner did not win a race in 1964 or 1965, but he finished in a few races each year. Petitioner was of the opinion that he could win or place in each race he entered if his car performed without mechanical problems. Petitioner's failure to win often resulted from mechanical breakdowns. Petitioner's driving ability would sometimes enable him to get to the front, but he would not be able to hold his place there because the car could not sustain performance or there would be a breakdown. Other drivers have similar problems. The mechanic tries to overcome and to prevent such failure by replacing and rebuilding parts, and by "taking down" the engine and "magnafluxing" the parts. However, it is difficult to foresee difficulty and to forestall breakdowns. Persons engaged in automobile racing who do overcome mechanical problems with their racers do not like to divulge their "speed secrets," such as the gear ratio used in a particular racer.

During the years 1964 and 1965 petitioner's arrangement with his mechanic, Henderson, was that petitioner paid for all parts for his

race cars and Henderson did the mechanical work in return for having his name appear on petitioner's car as an advertisement and a share of any purse won by petitioner. Henderson attended all races in which petitioner participated as a member of petitioner's pit crew. He observed petitioner as a driver and observed other drivers. Henderson considered petitioner's ability as a driver to be such that he should win many races if his car functioned properly.

Petitioner won nothing in 1962. He claimed no deductions on his Federal income tax return for racing expenses or racing losses for any year prior to 1962. The only race in which he drove in that year was the one in which he crashed the car. Petitioner won about $50 in 1963, $94 in 1964, $10 in 1965, and nothing in 1966. Petitioner's income tax returns for the years 1962 through 1966 show income and business loss deductions (racing) in the following amounts:

| Year | Income (all from North American Aviation) | Business loss deduction (racing) |
|---|---|---|
| 1962 | $9, 960. 96 | $1, 135. 00 |
| 1963 | 8, 908. 28 | 2, 493. 00 |
| 1964 | 9, 666. 00 | 3, 381. 00 |
| 1965 | 9, 813. 12 | 3, 251. 80 |
| 1966 | 11, 056. 76 | 2, 661. 85 |

During the years 1964 and 1965 the business loss resulted from subtracting from the racing income reported of $94 and $10, respectively, the following expenses:

| Expense | Amount | Expense | Amount |
|---|---|---|---|
| *1964* | | *1965* | |
| Business car expense | $459 | Maintenance and repair | $1, 461. 32 |
| Depreciation | 803 | Pit fees | 261. 50 |
| Dues and subscriptions | 30 | Advertising | 18. 00 |
| Insurance | 164 | Uniforms | ·85. 28 |
| Interest | 116 | Truck repairs | 694. 85 |
| Legal and accounting | 15 | Midget Racing Assn | 15. 00 |
| Rent | 261 | Truck licenses | 30. 00 |
| Repairs and maintenance | 1, 334 | Fuel for truck | 515. 85 |
| Taxes and licenses | 15 | Rent on business property | 180. 00 |
| Supplies | 41 | | |
| Telephone | 115 | | 3, 261. 80 |
| Utilities | 3 | | |
| Pit permits | 119 | | |
| | 3, 475 | | |

Respondent agrees that petitioner incurred the expenses as above listed in the years 1964 and 1965 in connection with his racing activities.

Respondent, in his notices of deficiency, determined that petitioner's income should be increased by $3,381.00 in 1964 and by $3,251.80 in 1965 with the explanation in each year that the loss from auto racing was being disallowed "because you have not established that you are entitled to such a deduction."

## OPINION

Section 162, I.R.C. 1954, provides for the deduction of ordinary and necessary expenses incurred in a trade or business. Petitioner's only contention in this case is that the deductions which he claimed for automobile-racing expenses are allowable under section 162.[1]

In order to be entitled to the deduction he claims in connection with automobile racing in each of the years here in issue petitioner must show that his automobile-racing activities during these years constituted a "trade or business."[2] Whether or not a taxpayer's activities constitute a trade or business is a question of fact to be determined from all the circumstances of each particular case. There are a number of factors that are considered in making this factual determination. Some of these factors are the time devoted by the taxpayer to the enterprise and the manner in which the taxpayer's records are kept and his transactions entered into. However, even where as here, the taxpayer devotes substantial time to the enterprise, keeps accurate records of his income and expenditures, and operates his undertaking in a businesslike manner, he has not established that he is engaged in a trade or business unless he proves that he conducted the operation for the purpose of making a profit. *Margit Sigray Bessenyey*, 45 T.C. 261 (1967), affd. 379 F. 2d 252 (C.A. 2, 1965), certiorari denied 389 U.S. 931; and *Hirsch* v. *Commissioner*, 315 F. 2d 731 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. The taxpayer's expectation of profit need not be a reasonable one and the fact of initial losses does not necessarily require a conclusion that the taxpayer does not have the requisite profit motive. The taxpayer's stated intention to make a profit is evidence to be considered along with the surrounding facts and circumstances in making the determination. *Lamont* v. *Commissioner*, 339 F. 2d 377 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court.

---

[1] SEC. 162. TRADE OR BUSINESS.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * *

[2] In a number of cases where the expenses of an operation exceeded the income therefrom, the resulting loss has been claimed under sec. 165(c)(1) permitting deduction by individuals of losses incurred in a trade or business. Since both secs. 162 and 165(c)(1) require that the taxpayer's expenditures be made in a trade or business, it is immaterial under the facts of this case whether the deductions, if allowable, come under secs. 162 or 165. The issue is whether petitioner was engaged in a trade or business.

In the instant case petitioner's uncontradicted testimony is that he undertook his racing activities for the purpose of making money. Petitioner's former roommate corroborated this testimony. The evidence shows that there was a practical possibility that petitioner could win enough money in a year to exceed his expenses. The evidence reveals that petitioner was totally ignorant of how racing was conducted until he began in 1960 to inquire into the field and to seek all information that he could find with respect thereto. Once he purchased his first car, he began to spend a great amount of time working on it and with it. He spent a large proportion of his income on his cars. His social activities declined because of the time and money he devoted to racing activities.

We are persuaded by the evidence in this case that petitioner began his racing activities with the idea of making a profit. We are also persuaded that although petitioner may have been naive, he was still engaging in his racing activities in the years here in issue with the idea of making a profit. While the knowledge petitioner gained from his failures in 1962 and 1963 might have dissuaded a less-determined person, we believe that during the 2 years here in issue petitioner still expected to make a profit from his racing when he finally got his car operating.

Respondent argues that at best petitioner was preparing to go into business as an automobile-racing driver and points out that expenses incurred in preparation for going into business are not deductible, citing *James M. Osborn*, 3 T.C. 603 (1944), and cases of similar import. While petitioner might have been preparing to be a driver for other owners, in our view the preponderance of the evidence shows that in 1964 and 1965 petitioner was entering his own car in races and driving it in races with the intent to make a profit.

Respondent argues that petitioner's lack of income from his racing activities in the years here in issue negates a profit motive. The years in issue, 1964 and 1965, are the first 2 years that petitioner participated regularly in races. He ran in only one race in 1962 and "blew" the engine. A new engine was installed but it could not be made to operate properly until 1964. Nevertheless, petitioner won prize money totaling $50 in 1963. The car operated better in 1964 after Henderson began to work on it and things looked more promising than they had up to that time. We do not believe that petitioner's expectation of profit lacked bona fides because he did not encounter immediate success.

Petitioner incurred losses of $3,628 up to 1964 and expenses of $3,475 in 1964. Respondent argues that under petitioner's own calculations, petitioner would have had to win first place in 10 races in 1965, or second place in 20 races, in order to recover these accumulated losses and expenses. Respondent contends that petitioner's entry in only 15

races in each of the years 1964 and 1965 means that petitioner was not seriously trying to make a profit.

We do not agree with respondent's reasoning. Petitioner did not specifically state why he entered only 15 races in each of the years here in issue, but petitioner did submit substantial evidence that he was plagued with mechanical breakdowns which he tried, but was not able, to eliminate. If petitioner had encountered fewer mechanical problems, undoubtedly he would have entered more races and he probably would have won more prize money. In any event, 15 entries in 1 year is better than 1 a month. This represents substantial activity. Therefore, we consider petitioner's stated intent to make a profit to be credible even though he entered only 15 races a year. Lastly, we do not agree with respondent that petitioner would have had to expect entire recovery in 1 year of all accumulated losses and expenses. It is enough if petitioner could expect within a reasonable time to recoup his losses and operate on a profitable basis.

Respondent argues that petitioner did not "hold himself out" as being in the racing business and that his activities were not continued, various, and regular. The record clearly indicates that petitioner openly engaged in racing activities. We consider that in this way petitioner did "hold himself out" as being engaged in the racing business. The record is replete with evidence showing that petitioner's activities were continuous, varied, and regular. Besides working on and running his own car, he sought ownership interests with at least two other men in other cars, he worked in the pit crew for another owner, and he was seeking opportunities to drive for other owners.

From the record as a whole we conclude that during the years 1964 and 1965 petitioner was engaged in the trade or business of automobile racing and is entitled in each of those years to deduct the expenses which respondent concedes he incurred in connection with this activity.

Because of the concession by petitioner of another issue,

*Decision will be entered under Rule 50.*