CHRISTOPHER MICHAEL FRANZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Franz v. Commissioner
Docket No. 15125-82.
United States Tax Court
T.C. Memo 1984-506; 1984 Tax Ct. Memo LEXIS 171; 48 T.C.M. (CCH) 1196; T.C.M. (RIA) 84506; September 20, 1984
Christopher Michael Franz, pro se. Nancy B. Herbert, for the respondent. WILES MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the years 1977, 1978 and 1979 in the amounts of $2,571, $2,795, and $3,400.16, respectively. After concessions by petitioner, the sole issue remaining for decision is whether petitioner's drag racing activity during the years in question was an activity engaged in for profit under section 183. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Christopher Michael Franz (hereinafter petitioner) was a resident of Dayton, Ohio, at the time of the filing of the petition in this case. Petitioner timely filed his 1977, 1978 and 1979 *173 Federal income tax returns with the Internal Revenue Service Center in Fresno, California. On July 25, 1979, petitioner filed an amended Federal income tax return for 1977. Petitioner received a Bachelor of Arts degree in government from California State University in 1974. From 1974 through the years in question, petitioner maintained full-time employment with the United States Air Force, working in aircraft repair and maintenance. During 1976, petitioner became a supervisor in charge of an aircraft maintenance crew and retained that position through 1979. In 1980 he was transferred to work at Wright Patterson Air Force Base in Dayton, Ohio. Petitioner's mechanical inclination extended to automobiles. In 1974 petitioner began spending significant time in the sport of drag racing. That year he purchased his first auto to be used specifically for racing purposes at a cost of $2,996. Petitioner hoped to recoup some of this expenditure by winning or placing second or third in various races in a racing circuit located mostly in northern California. Most drag races at these tracks were held on weekends. The purses varied in size from $400 for a first place finish to *174 as little as a trophy for lower finishes. Petitioner never entered a race that did not have a cash prize for the first three places. Petitioner decided that in order to become a successful racer an additional automobile was necessary.In 1976 he purchased a second vehicle for $3,057. Petitioner though two cars were needed because he had experienced bad luck mechanically with his first car and while it was being repaired he could not race. Also, he felt his chances of winning races would be augmented with a second car. Petitioner realized in 1976 that sponsors could help defray the costs of auto racing. In 1977 petitioner secured an auto parts supplier, Tognotti's Auto World, as a sponsor. Tognotti's Auto World provided petitioner with a discount on automobile supplies and parts in return for displaying its name on petitioner's vehicles. Although he received a discount on parts, petitioner did not use top-grade replacement parts in his automobiles because of the corresponding expense. He instead tried to "get by" on parts which functioned "something less". Petitioner's cars required special engineering, which was performed by Alston Engineering (Alston), a prominent *175 firm in the drag racing world. Petitioner also acquired Alston as a sponsor. Petitioner displayed Alston's name on his cars and made them available for displays demonstrating Alston's engineering ability. In exchange Alston agreed to pay petitioner in cash or services various amounts for winning main events and for finishing in at least the fourth round. [2]
During the years in issue, petitioner's cars were run as "bracket" cars, [3] and were entered in 96 races. [4] The expenditures by petitioner for his drag racing activity averaged approximately $700, $850, and $1,080 per month in 1977, 1978, and 1979, respectively. The average cost per race based on total expenditures was as follows: Year
Cost
1977
$377.45
1978
321.23
1979
316.25
*176 The figures include amounts expended for many severe mechanical breakdowns. The marginal cost per race during that same period was as follows: Year
Cost
1977
$259.73
1978
227.10
1979
230.54
Petitioner would stand to make a profit from a race if either car finished first, or if both cars finished second. If both cars had finished third, petitioner's winnings would not have reached the break even point. During the years in issue, petitioner never finished first in any race. From 1974 through 1979, petitioner's income from drag racing was as follows: Year
Item
1974
1975
1976
1977
1978
1979
Income
$145.75
$173.00
$387.55 Petitioner *177 used the income from his job as a mechanic to finance his drag racing activities. His expenses for the same period above were as follows: Year
Item
1974
1975
1976
Depreciation
*
*
$1,276.00
Repairs
277.00
Oper. Exp.
8,760.17
Other Exp.
1,039.50
Total
Expenses
$5,280 **
$4,909 **
$11,352.67
Year
Item
1977
1978
1979
Depreciation
$1,276.00
$1,276.00
$1,338.40
Repairs
5,547.00
6,735.00
Oper. Exp.
8,065.87
Not Available
Other Exp.
1,051.87
4,091.00
5,557.00
Total
Expenses
$10,393.74
$10,914.00
$13,630.40
Petitioner therefore incurred the following losses for the years 1974 through 1979: Year [5]
Income
Expense
Net
1974
$5,280.00
$ (5,280.00)
1975
4,909.00
(4,909.00)
1976
11,352.67
(11,352.67)
1977
145.75
10,393.74
(10,247.99)
1978
173.00
10,914.00
(10,741.00)
1979
387.55
13,630.40
(13,242.85)
Total
$706.30
$56,479.81
($55,773.51)
Total (years
1976-1979)
$706.30
$46,290.81
($45,584.51)
*178 Petitioner deducted the net losses listed above from his income in each of the corresponding years 1976 through 1979. [6] In the notice of deficiency, respondent disallowed the losses because he concluded that petitioner's auto racing was an activity not engaged in for profit. OPINION The sole issue before us in whether petitioner's drag racing was an "activity * * * not engaged in for profit" under section 183. Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable * * * under section 162 or under * * * section 212." If petitioner's drag racing business is not engaged in for profit then deductions arising from his drag racing are allowed only to the extent of gross income earned from such activity. [7]Sec. 183(b)(2). If the activity *179 was engaged in for profit, all of the claimed expenses are fully deductible under section 162. Benz v. Commissioner,63 T.C. 375, 383 (1974). To qualify his drag-racing activity as a trade or business under section 162, petitioner must prove that his endeavors were entered intowith the primary intention and motivation to make a profit. Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F. 2d 170 (9th Cir. 1981); Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). Petitioner must have entertained an actual and honest profit objective in connection with his activities. Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without published opinion 702 F. 2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one, but there must be *180 a good faith objective of making a profit. Section 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner,supra at 645. The determination of whether the requisite profit objective exists is to be resolved on the basis of all the surrounding facts and circumstances of the case. Section 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,supra at 426. Greater weight is to be given to the objective facts than to the taxpayer's mere statement of his intent. Section 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner,supra at 645. Petitioner has the burden of proof to show he had the requisite intention and that the respondent's determination that the activities were not engaged in for profit is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Golanty v. Commissioner,supra at 426; Rule 142(a), Tax Court Rules of Practice and procedure.
Section 1.183-2(b), Income Tax Regs. *181 , provides a list of relevant factors to be considered in determining whether an activity is engaged in for profit. The Regulations further provide that the determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. See sec. 1.183-2(b), Income Tax Regs.
After careful consideration of the entire record, we find that petitioner was not engaged in racing autos for profit and, accordingly, hold for respondent. We see no substantial difference between the facts of this case and those in Casida v. Commissioner,T.C. Memo. 1979-267. In Casida, the taxpayer had been recreationally drag racing automobiles for a number of years. He contended that he then stopped racing for recreational purposes and started looking toward making a profit. Over a period of six years, the taxpayer in Casida received $4,184 in income from racing and incurred $30,732 in losses. Focusing on the limited sponsorship the taxpayer received, the small purses of his racing circuit that would not enable him to approach supporting himself, *182 [8] and the fact that the recreational character of his racing activities did not change from before he declared himself a professional racer and after, we concluded that the taxpayer in Casida was not engaged in an activity for profit. Petitioner's attempt to distinguish Casida is unconvincing. The taxpayer in Casida made in excess of four times what petitioner did (on a scaled comparison) while incurring approximately only 70 percent of petitioner's costs. Even without the larger purses of the nationals, petitioner had much less prospect of turning a profit than did the taxpayer in Casida.Also, while petitioner invested more capital in 1976, the recreational aspects--and results of--petitioner's racing did not, in general, change significantly from the years prior to that year. Although the number of races entered did increase, they still only averaged approximately one per weekend. Petitioner has not shown that his activities increased sufficiently to transcend the pleasure he received from racing into something nonrecreational. *183 Finally, the extent to which petitioner received sponsorship support was not appreciably different from what the situation was in Casida.[9]
Petitioner's assertion that his large losses resulted from unexpected mechanical breakdowns is unpersuasive. Breakdowns are a way-of-life for the professional racer, and they are to be anticipated.While petitioner's mechanical breakdowns may have been unexpectantly severe, they were not so significant as to alter what his estimate of winnings would be in order for him to turn a profit. Even if all the mechanical breakdowns were eliminated, his operating expenses exceeded his actual racing income at a ratio far in excess of 10-to-1. Notwithstanding petitioner's abilities, we think even normal operations would not have stemmed *184 the tide of losses, and petitioner never really expected to do so. Petitioner further argues that the large losses by themselves should not bring him within the purview of section 183. Petitioner's argument is inaccurate.Although not conclusive, a record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention. Golanty v. Commissioner,supra at 426; Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F. 2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). In the present case, petitioner experienced heavy losses and miniscule success over a period in excess of five years. He could not expect, given the level of competition, the corresponding size of purses, and his past ratio of winnings to losing, that his racing activity would be profitable in any year, let alone that he would recoup previous losses. Petitioner did not upgrade his car with admittedly better parts, even after numerous breakdowns. Moreover, *185 petitioner did not reevaluate his chances for success, even when faced with comparatively massive losses. [10]
Accordingly, based on this record, we hold that petitioner did not engage in drag racing during the years in question with the objective of making a profit. Therefore, the provisions of section 183 apply. [11]
Decision will be entered under Rule 155.
Footnotes
1. All section references shall be to the Internal Revenue Code of 1954, as amended.↩
2. Petitioner would received $100 for winning one main event. Two hundred fifty dollars would be paid for winning two main events, and $400 for winning three or more main events. As petitioner never won a main event, the money available for other finishes was important. Petitioner would receive the following amounts if he finished in the respective rounds: ↩
Finish
Amount
4th round
$50
3rd round
75
2nd round
125
1st round
200
3. A bracket car simply runs against times, or a set standard, as opposed to a "class" car, where competition is limited only to vehicles in that class. A bracket car can be scattered among various classifications. The financial result of the distinction is that, with a class car, it is usually possible to make a profit only by entering national events (the nationals). ↩
4. In 1977, 23 races were entered. He raced 32 times in 1978 and 41 times in 1979.↩
*. Petitioner concedes the drag racing activities amounted to only a hobby in 1974 and 1975, and therefore no depreciation was allowable. ** Only total expenditures were available.↩
5. Although petitioner concedes that the losses incurred in 1974 and 1975 were from the pursuit of a hobby, they are pertinent in order to establish a pattern prior to those years presently before us.↩
6. The 1976 year was not challenged by respondent.↩
7. Under section 183(b)(1)↩, petitioner is entitled to deductions that would be allowable without regard to whether the activity was engaged in for profit, such as interest and taxes.
8. In Casida,↩ the taxpayer did not race in the nationals, which would almost have been a necessity in order to turn a profit.
9. Petitioner also argues that he kept good business records, while the taxpayer in Casida did not. Though we have afforded this some weight, we think on this record it is of little consequence when compared to the other objective factors considered. See Golanty v. Commissioner,72 T.C. 411, 430 (1979), affd. without published opinion 647 F. 2d 170↩ (9th Cir. 1981).
10. His retirement from drag racing in 1980 was occasioned by his transfer to Wright Patterson Air Force Base in Dayton, Ohio, and not from his realization that his attempts to make a profit would fail.↩
11. In reaching this conclusion, we have considered Bolt v. Commissioner,50 T.C. 1007 (1968), and Demler v. Commissioner,T.C. Memo. 1966-117↩, both of which we find distinguishable.