WILLIAM F. SUTTON AND HELEN C. SUTTON, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 22131–81,                    Filed February 13, 1985.
22639–81 (Nitrol Issues),
28537–81,
13350–82,
18891–82,
3114–83.

---

[1]Cases of the following petitioners are consolidated herewith: John F. Knowlton and Betty W. Knowlton, docket No. 22639–81 (Nitrol Issues); Joseph W. Fleece, Jr., and Joanne M. Fleece, docket No. 28537–81; John C. Pruitt and Frances M. Pruitt, docket No. 13350–82; Jules Dressler and

*B. Gray Gibbs*, for the petitioners.
*Andrew M. Winkler*, for the respondent.

NIMS, *Judge*: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 22131–81 | William F. Sutton | 1977 | $62,616.00 |
| | and Helen C. Sutton | 1978 | 60,127.00 |
| 22639–81 | John F. Knowlton | 1977 | 61,924.00 |
| | and Betty W. Knowlton | 1978 | 63,281.00 |
| 28537–81 | Joseph W. Fleece, Jr., | 1975 | 13,784.00 |
| | and Joanne M. Fleece | 1976 | 9,200.00 |
| | | 1977 | 108,792.00 |
| | | 1978 | 69,457.00 |
| | | 1979 | 97,811.00 |
| 13350–82 | John C. Pruitt | 1976 | 44,301.10 |
| | and Frances M. Pruitt | 1977 | 101,453.70 |
| | | 1978 | 74,268.70 |
| | | 1979 | 17,446.18 |
| 18891–82 | Jules Dressler | 1978 | 2,084.00 |
| | and Muriel Dressler | | |
| 3114–83 | R. Huston Babcock | 1977 | 52,247.00 |
| | and Suzanne Babcock | 1978 | 39,366.00 |
| | | 1979 | 45,787.00 |

One of the issues in docket No. 22639–81 was severed from this consolidated case and is the subject of a separate opinion by Judge Tannenwald reported at 84 T.C. 160 (1985). Judge Nims did not participate in the trial or opinion with regard to the severed issue. Judge Tannenwald's disposition of the

---

Muriel Dressler, docket No. 18891–82; R. Huston Babcock and Suzanne Babcock, docket No. 3114–83.

severed issue will be incorporated into the Rule 155 computation required in docket No. 22639–81.

Due to concessions, the issues for decision are: (1) Whether petitioners' Nitrol Program activities were engaged in for profit within the meaning of section 183; and (2) whether certain nonrecourse notes may be included in the basis of the specially equipped refrigerated highway freight trailers acquired by petitioners.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Joseph W., Jr., and Joanne M. Fleece, husband and wife, John C. and Frances M. Pruitt, husband and wife, John F. and Betty W. Knowlton, husband and wife, and R. Huston and Suzanne Babcock, husband and wife, resided at St. Petersburg, Florida, at the time their respective petitions were filed. Petitioners William F. and Helen C. Sutton, husband and wife, resided at Tampa, Florida, at the time their petition was filed. Petitioners Jules and Muriel Dressler, husband and wife, resided at Ft. Lauderdale, Florida, at the time their petition was filed.

For convenience, William F. Sutton, Betty W. Knowlton, Joseph W. Fleece, Jr., John C. Pruitt, R. Huston Babcock, and Jules Dressler will sometimes hereinafter be referred to as petitioners.

During the years in issue, petitioners were employed as follows:

| Petitioner | Profession |
| --- | --- |
| Sutton | Executive |
| Knowlton | Hotel manager |
| Fleece | Attorney |
| Babcock | Physician |
| Pruitt | Physician |
| Dressler | Executive |

In December 1977, petitioners invested in a program (the Nitrol Program) offered by two California corporations, Nitrol Corp. (Nitrol) and Transit Management Co. (TMC). Under the program, investors purchased refrigerated highway freight

trailers equipped with "controlled atmosphere units" from Nitrol and entered into a trailer management agreement with TMC. For convenience, we will hereinafter refer to the controlled atmosphere units as the Nitrol units and the refrigerated highway freight trailers equipped with the Nitrol units as the Nitrol trailers.

Sutton, Knowlton, and Babcock each purchased one Nitrol trailer. Fleece and Pruitt each purchased two Nitrol trailers. Dressler owned a limited partnership interest in Overnite, Ltd., a limited partnership formed to purchase one Nitrol trailer. For purposes of this opinion, reference to the term "petitioners" for convenience also sometimes refers to Overnite, Ltd., and/or the general partner of that partnership.

David Dixon, a mechanical engineer, designed the Nitrol unit to produce a low-oxygen environment within the interior compartment of a standard refrigerated highway freight trailer. He worked from 1966 to 1968 developing the Nitrol unit. In June 1976, he received a patent (the 477 Patent) for the Nitrol unit.

The Nitrol unit consisted of an insulated storage tank filled with liquid oxygen and nitrogen mounted on the chasis of a refrigerated highway freight trailer. As the liquid vaporized, gases entered the trailer compartment through metal tubes leading from the tank to the compartment, producing a low-oxygen environment within the interior of the trailer.

Studies conducted during the early 1960's by Dixon concluded that perishable commodities shipped in a low-oxygen environment would generally remain fresher than if shipped in a standard refrigerated truck. From the mid-1960's to the mid-1970's, several companies attempted to market trailers designed to transport perishable commodities in a low-oxygen environment. The unprofitability of the venture, however, forced each company to abandon the project.

Sometime during early 1977, Dixon, Steven Lewis (Lewis), James Power (Power), and Dorman Dimmitt (Dimmitt) joined together to develop the Nitrol Program to economically exploit the 477 Patent. Power incorporated Nitrol on June 3, 1977, to construct approximately 100 Nitrol trailers. Dimmitt, who had managed several trucking companies prior to his association with the Nitrol Program, incorporated TMC on July 11, 1977,

to manage the Nitrol trailers sold by Nitrol. Dimmitt also became the chief operating officer of TMC.

Subsequent to the incorporation of Nitrol, Dixon and Lewis transferred an exclusive license under the 477 Patent to Nitrol. Nitrol agreed to pay Dixon and Lewis 70 percent of the net profits realized from the sale of Nitrol trailers. Power, as Nitrol's sole shareholder and chief operating officer, effectively retained 30 percent of Nitrol's profits.

Following the receipt of the exclusive license, Nitrol purchased 100 refrigerated highway freight trailers from Sierra Truck & Trailer Sales, Inc. (Sierra), for $27,500 per trailer. Nitrol financed the purchase of the trailers with Hobbs Corp. (Hobbs), the manufacturer of the trailers. Hobbs retained a security interest in each trailer sold. Although Nitrol was primarily liable on the installment contracts, all Nitrol Program investors were given the right to cure any default on the installment contracts.

Nitrol also contracted with Gibson Cryogenics to construct approximately 100 Nitrol units pursuant to Dixon's specifications. Nitrol paid approximately $2,430 for the manufacture and installation of each Nitrol unit.

Petitioners first learned of the Nitrol Program from their accountants and attorneys in November 1977. In December 1977, after reviewing a private placement memorandum detailing the Nitrol Program and discussing the investment with their accountants and attorneys, petitioners invested in the Nitrol Program. Neither petitioners nor their advisers had previous experience in the trucking industry.

Petitioners purchased each Nitrol trailer for $275,000, the consideration consisting of a $27,500 cash downpayment and a nonrecourse promissory note in the amount of $247,500. Agreements executed contemporaneously with the nonrecourse notes provided that the total purchase price of $275,000 was allocable as follows: $32,500 to the trailer and $242,500 to the Nitrol unit.

Petitioners entered into 10-year trailer management agreements with TMC contemporaneously with the purchase of the Nitrol trailers. Pursuant to these agreements, TMC agreed to solicit and negotiate freight contracts with shippers on behalf of petitioners. Dimmitt intended to contract with produce growers shipping perishable commodities from the west coast

to the east coast. For the return trip from the east coast, however, Dimmitt intended to lease the trailers to a common carrier under a trip leasing agreement.[2] Dimmitt anticipated that the common carriers would ship nonperishable commodities and thus would not utilize the Nitrol process.

In addition, TMC agreed to: (1) Locate tractors and drivers to pull petitioners' Nitrol trailers; (2) maintain books and records of the receipt and disbursement of money received pursuant to the freight contracts; (3) repair and maintain petitioners' Nitrol trailers; and (4) furnish petitioners with quarterly reports of income and expenses from the trailers' operation. In effect, TMC agreed to perform all functions necessary to maintain and operate petitioners' Nitrol trailers.

In return, petitioners agreed to pay TMC an initial management fee of $2,000 per trailer plus 3 percent of the gross revenues earned from the operation of each trailer. Petitioners also contributed operating capital of $12,500 per trailer to TMC in 1977.

The private placement memorandum provided that the Nitrol trailers were expected to generate sufficient revenues to pay all operational expenses, the amounts due under the terms of the notes, and return a pre-tax profit of $152,279 per trailer. This projection was based on each trailer's making three coast-to-coast round trips of 5,600 miles per month for 12½ years.

Each trailer was expected to earn an average of $0.86 per revenue mile. The revenue per mile rate did not reflect a premium for shipments utilizing the controlled atmosphere system. Rather, Dixon and Dimmitt computed total revenue miles on the assumption that the benefits of the controlled atmosphere system would increase the demand for petitioners' Nitrol trailers.

In addition to the projected profit, the private placement memorandum informed potential investors that an investment in the Nitrol Program would produce operating loss deduction equivalents during the first 3 years of the investment equal to approximately 517 percent of petitioners' initial

---

[2]Pursuant to regulations promulgated by the Interstate Commerce Commission, only common carriers were authorized to carry commodities regulated by the ICC. TMC was not a common carrier and thus was allowed to carry only commodities the ICC classified as exempt, such as produce. By engaging in trip leasing with common carriers, however, TMC was allowed to transport regulated commodities on the return trip from the east coast.

cash investment of $40,000. The private placement memorandum stated, however, that any gain realized on the disposition of the trailer would constitute ordinary income to the extent of all depreciation deductions previously claimed by the owner. Moreover, if the disposition occurred within 7 years from the date of acquisition, part or all of the investment tax credit previously claimed would be recaptured from the investor.

Petitioners purchased the Nitrol trailers through Lee Puckett (Puckett), a St. Petersburg, Florida, investment broker engaged in the marketing of tax shelters. Puckett received a $4,000 commission for each Nitrol Program package he sold. This represented 10 percent of the total cash outlay of $40,000 per trailer.

Puckett became familiar with the Nitrol Program in August 1977. Prior to presenting the investment to petitioners, Puckett hired John Kearney (Kearney), an accountant, and Richard Jacobs (Jacobs), an attorney, to assist him in an analysis of the investment. Neither Puckett, Kearney, nor Jacobs had previous experience in the trucking industry.

Puckett, Kearney, and Jacobs traveled to California and spent 4 days investigating the Nitrol Program. During the course of the investigation, they: (1) Met with Dimmitt, Power, and Dixon to discuss the Nitrol Program, including the projections of revenues and expenses contained in the private placement memorandum; (2) met with representives of the accounting firm and law firm hired by Dixon to prepare the disclosure memorandum; and (3) received testimonials confirming the performance of the Nitrol unit. Following their investigation, Puckett decided to market the Nitrol Program.

TMC began operating petitioners' Nitrol trailers in January 1978. The Nitrol trailers' lack of profitability became immediately apparent. In September 1978, Puckett, Kearney, and Jacobs traveled to California to further discuss the operation of petitioners' Nitrol trailers with Dimmitt and Power. The reasons they received for the Nitrol trailers' lack of profitability included the following: (1) The difficulty in obtaining owner-operators with tractors to pull the Nitrol trailers; (2) the downturn in the economy following commencement of trailer operations; and (3) the severe weather in the Northeast and a rainy season in California during the winter of 1977–78.

As a result of the trailers' unprofitability, TMC was unable to make payments on petitioners' nonrecourse notes held by Nitrol. Consequently, Nitrol was unable to satisfy the amounts due on the Hobbs installment contracts. In September 1978, Kearney, Jacobs, and Puckett negotiated an amendment to petitioners' nonrecourse notes which required petitioners to make payments from October 31, 1978, to January 31, 1983, only to the extent of income earned by the Nitrol trailers.

By letter dated September 9, 1978, Puckett informed petitioners of TMC's need for additional working capital. He concluded the letter as follows:

I recognize no one wants to contribute capital but;

(A). There are about $70,000 to $80,000 of estimated deductions available this year if the trailer keeps operating. Capital will do it.

(B). If the trailer does not operate and foreclosure results you will have substantial recapture of prior losses—perhaps as much as $100,000 of taxable income.

Thus, it appears prudent to consider making a reasonable capital advance* * *

Petitioners, except for Overnite, Ltd., subsequently contributed $8,000 per trailer to TMC's operating capital. Overnite, Ltd., contributed $3,920.

By letters dated April 3, 1979, and May 10, 1979, Hobbs notified petitioners that Nitrol was in default on the Hobbs installment contracts. In response, petitioners retained Jacobs and Kearney to determine the status of the Nitrol Program. Following an investigation, Jacobs and Kearney recommended that petitioners satisfy the outstanding balance due on the Hobbs installment contracts. Pursuant to these recommendations, petitioners, except for Dressler and Overnite, Ltd., satisfied the outstanding balances as follows:

| Petitioner | Date credited by Hobbs | Balance due (paid off) |
|---|---|---|
| Sutton | 9/29/79 | $13,015.86 |
| Knowlton | 10/31/79 | 12,637.81 |
| Fleece | 9/29/79 | 27,017.37 |
| Pruitt | 9/26/79 | 25,056.97 |
| Babcock | 9/26/79 | 13,543.56 |

Overnite, Ltd., refinanced the $26,865 balance then due Hobbs.

As a result of petitioners' payment of the balance due on the installment contracts, Nitrol amended petitioners' nonrecourse notes a second time as follows: (1) The outstanding principal balance due on the note ($247,500) would be reduced by the amount each petitioner paid to Hobbs; and (2) subsequent payments on the notes would be suspended until January 1, 1983.

On September 4, 1979, petitioners terminated the TMC management agreement and, except for Dressler and Overnite, Ltd., entered into a transportation management agreement with Road West Co. (Road West), a California corporation. Road West agreed to distribute gross revenues received from the shipping contracts as follows: 70 percent to the tractor owner, 10 percent to the trailer owner, and 20 percent to Road West.

In September 1979, pursuant to the recommendation of Richard Goodin, president of Road West, petitioners, except for Dressler and Overnite, Ltd., entered into installment contracts to purchase highway tractors for $41,400 per tractor. Goodin believed the lack of owner-operators to pull petitioners' Nitrol trailers was the major reason for the trailers' unprofitability.

Petitioners' Nitrol trailers nonetheless continued to sustain losses under Road West's management. Road West eventually removed the Nitrol units from petitioners' trailers.

In the spring of 1983, petitioners sold the tractors and terminated the Road West management agreement. They arranged to lease the trailers (without the Nitrol units) to Road West for a monthly rental of $315.

During the period of the Road West management agreement, petitioners made contributions to Road West's working capital, including amounts due on petitioners' tractors, as follows:

| Petitioner | Amount |
| --- | --- |
| Fleece | $81,278.20 |
| Knowlton | 63,737.20 |
| Sutton | 25,895.97 |
| Pruitt | 11,500.00 |
| Babcock | 11,500.00 |

From 1977 to 1982, petitioners claimed investment credits and operating loss deductions with respect to the Nitrol trailers as follows:

| Petitioner | Year | Investment credit | | Loss |
|---|---|---|---|---|
| Sutton | 1977 | $27,500 | | $50,217 |
| | 1978 | | | 85,959 |
| | 1979 | | | 71,710 |
| | 1980 | | | 54,345 |
| | 1981 | | | [1]11,775 |
| | 1982 | | | [2]10,704 |
| | | | Total | 284,710 |
| Knowlton | 1977 | 27,500 | | 49,237 |
| | 1978 | | | 78,800 |
| | 1979 | | | 70,146 |
| | 1980 | | | 49,637 |
| | 1981 | | | [3]24,131 |
| | 1982 | | | [4] 0 |
| | | | Total | 271,951 |
| Fleece | 1977 | 55,000 | | 95,186 |
| | 1978 | | | 161,885 |
| | 1979 | | | 136,009 |
| | 1980 | | | 97,064 |
| | 1981 | | | [5]75,886 |
| | 1982 | | | [6] 0 |
| | | | Total | 566,030 |
| Pruitt | 1977 | 55,000 | | 97,408 |
| | 1978 | | | 164,873 |
| | 1979 | | | 134,542 |
| | 1980 | | | 97,504 |
| | 1981 | | | 74,657 |
| | 1982 | | | 71,552 |
| | | | Total | 640,536 |
| Babcock | 1977 | 27,500 | | 49,494 |
| | 1978 | | | 81,098 |
| | 1979 | | | 65,163 |
| | 1980 | | | 33,185 |
| | 1981 | | | 27,381 |
| | 1982 | | | 36,878 |
| | | | Total | 293,199 |
| Overnite, Ltd. | 1977 | 27,500 | | 15,558 |
| | 1978 | | | 82,912 |
| | 1979 | | | 55,481 |

| Petitioner | Year | Investment credit | Loss |
|---|---|---|---|
| | 1980 | | $30,215 |
| | 1981 | | 30,215 |
| | 1982 | | 30,215 |
| | | Total | 244,596 |

[1]Sutton's Nitrol trailer realized an actual loss of $34,159 during 1981. The "at risk" limitations of sec. 465 limited Sutton's deduction to $11,775.
[2]Sutton's Nitrol trailer realized an actual loss of $34,842 during 1982. The "at risk" limitations of sec. 465 limited Sutton's deductions to $10,704.
[3]Knowlton's Nitrol trailer realized an actual loss of $37,859 during 1981. The "at risk" limitations of sec. 465 limited Knowlton's deduction to $24,131.
[4]Knowlton's Nitrol trailer realized an actual loss of $17,916 during 1982. The "at risk" limitations of sec. 465 limited Knowlton's deduction to 0.
[5]Fleece's Nitrol trailer realized an actual loss of $95,729 during 1981. The "at risk" limitations of sec. 465 limited Fleece's deduction to $75,886.
[6]Fleece's Nitrol trailer realized an actual loss of $29,144 during 1982. The "at risk" limitations of sec. 465 limited Fleece's deduction to 0.

During the years in issue, petitioners reported taxable income (before claiming the Nitrol loss deductions) on their Federal income tax returns as follows:

| Petitioner | Year | Taxable income |
|---|---|---|
| Sutton | 1977 | $1,004,301 |
| | 1978 | 702,171 |
| Knowlton | 1977 | 417,780 |
| | 1978 | 455,561 |
| Fleece | 1977 | 292,157 |
| | 1978 | 135,917 |
| | 1979 | 140,392 |
| Babcock | 1977 | 131,925 |
| | 1978 | 86,872 |
| | 1979 | 128,223 |
| Pruitt | 1977 | 625,385 |
| | 1978 | 362,247 |
| | 1979 | 111,407 |

In his notice of deficiency, respondent allowed petitioners' claimed loss deductions to the extent permitted by section 183[3] for the years at issue. Respondent fully disallowed the investment credits claimed by petitioners in 1977.

---

[3]Unless otherwise indicated, all section references are to sections of the Internal Revenue Code of 1954 in effect for the years in question.

## OPINION

Respondent argues that petitioners are not entitled to the claimed losses and investment credits because they did not engage in the Nitrol Program for profit within the meaning of section 183. In the event we find that petitioners did possess the requisite profit motive, respondent argues in the alternative that petitioners' basis in the Nitrol trailers should not include the $247,500 nonrecourse notes for the following reasons: (1) The notes are contingent and speculative, and (2) the amount of each nonrecourse note unreasonably exceeds the fair market value of each Nitrol trailer. For the reasons stated below, we agree with respondent that petitioners' Nitrol program activities were not engaged in for profit within the meaning of section 183. Accordingly, we need not address respondent's alternative arguments.

A taxpayer[4] must engage in an activity with the primary purpose and objective of making a profit in order to fully deduct expenses under either section 162 or section 212 (*Golanty v. Commissioner*, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981)) and to claim investment credits under section 38. *Pike v. Commissioner*, 78 T.C. 822, 841–842 (1982). "While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide." *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. by order 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. *Kratsa v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner*, 734 F.2d 5 (3d Cir. 1984); *Dreicer v. Commissioner*, 78 T.C. 642, 644–645 (1982), affd. without opinion 702 F.2d 1204 (D.C. Cir. 1983).

The issue of whether a taxpayer engages in an activity with the requisite objective of making a profit is one of fact to be resolved on the basis of all the facts and circumstances. *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981). The burden of proving the requisite intention is on petitioners. *Sabelis v. Commissioner*, 37 T.C. 1058, 1062 (1962); Rule 142(a).

---

[4]For purposes of determining whether Dressler is entitled to claim loss deductions and an investment credit in excess of the amount allowed by respondent, the intent of Overnite, Ltd., is controlling. *Fox v. Commissioner*, 80 T.C. 972 (1983).

Section 183 allows deductions for ordinary and necessary expenses arising from an activity not engaged in for profit only to the extent of gross income derived from such activity, less the amount of those deductions which are allowable regardless of whether or not the activity is engaged in for profit.[5]

Section 1.183–2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is "not engaged in for profit." These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

Petitioners testified at trial that they would not have invested in the Nitrol Program unless they intended to make an economic profit. We must, nevertheless, give greater weight to objective factors than to petitioners' mere statement of intent. Sec. 1.183–2(a), Income Tax Regs. Accordingly, for the

---

[5]Sec. 183 reads, in relevant part, as follows:

SEC. 183(a). GENERAL RULE.—In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

(d) PRESUMPTION.—If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years.

reasons set forth below, we are convinced that petitioners intended to make a tax profit, not an economic profit, when they invested in the Nitrol Program.

First, we do not believe that petitioners would have agreed to pay $275,000 for each Nitrol trailer if they had been concerned with the economic profitability of the investment. The record contains no evidence which convinces us that petitioners believed the economic potential of each Nitrol trailer would support a $275,000 purchase price. TMC did not intend to charge a premium for shipments utilizing the Nitrol process. In addition, TMC anticipated that the trip-leasing arrangements from the east coast to the west coast would generally involve nonproduce items which would realize no benefits from the Nitrol process. Nevertheless, the Nitrol trailer's purchase price approximated the cost of 10 standard refrigerated trailers. Moreover, the portion of the purchase price allocated to each Nitrol unit ($247,500) equaled more than 100 times the construction cost of each Nitrol unit.

Conversely, a $275,000 basis in each Nitrol trailer would generate a substantial tax profit. The disclosure memorandum stated that a $40,000 investment in the Nitrol Program would alone give rise to tax deduction equivalents of approximately $206,800 in the first 3 years of the investment. A 50-percent tax bracket taxpayer would realize tax benefits of approximately $103,400. Thus, in the first 3 years of their investment, petitioners anticipated tax savings in excess of 250 percent of each $40,000 cash investment.[6]

---

[6]The relevant tax rates applicable to taxable income on joint returns during the years in issue were as follows:

*Taxable income*
*1977–78*

| | |
|---|---|
| Over $67,200 – $79,200 | 55 percent |
| Over 79,200 – 91,200 | 58 percent |
| Over 91,200 – 103,200 | 60 percent |
| Over 103,200 – 123,200 | 62 percent |
| Over 123,200 – 143,200 | 64 percent |
| Over 143,200 – 163,200 | 66 percent |
| Over 163,200 – 183,200 | 68 percent |
| Over 183,200 – 203,200 | 69 percent |
| Over 203,200 | 70 percent |

*1979*

| | |
|---|---|
| Over 60,000 – 85,600 | 54 percent |
| Over 85,600 – 109,400 | 59 percent |
| Over 109,400 – 162,400 | 64 percent |

Moreover, petitioners manufactured the high basis and corresponding tax benefits through the use of large nonrecourse financing. The percentage of the purchase price financed with nonrecourse notes (90 percent), in combination with the large purchase price agreed to by petitioners, is strong evidence that the potential tax profit, and not the potential economic profit, motivated petitioners' investment in the Nitrol Program. See *Fox v. Commissioner, supra.*

Petitioners claim that the profit projections contained in the private placement memorandum support the Nitrol trailer's $275,000 purchase price. Petitioners' cursory investigation of the profit projections prior to investing in the Nitrol Program, however, is further evidence that petitioners were not concerned with the investment's profit potential. *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984). Neither petitioners nor the advisers they contacted prior to investing in the Nitrol Program possessed sufficient knowledge of the trucking industry to independently verify the profit projections contained in the private placement memorandum. Furthermore, neither petitioners nor their advisers contacted independent experts to verify the reasonableness of the profit projections.

Petitioners argue that they relied on the investigations conducted by Puckett, Kearney, and Jacobs. We are not, however, persuaded by this argument. Neither Puckett, Kearney, nor Jacobs was qualified to independently evaluate the profit projections contained in the private placement memorandum. Moreover, the three men made no effort to discuss the profit potential of the investment with independent experts, including the companies which had previously attempted to market controlled atmosphere trailers. They relied almost exclusively on the representations of Dixon and Dimmitt.

Petitioners' realization of substantial losses from 1977 to 1983 is additional evidence that petitioners did not engage in the Nitrol Program for profit. Sec. 1.183–2(b)(6), Income Tax Regs.; *Wiles v. United States*, 312 F.2d 574, 576 (10th Cir.

---

| | | |
|---|---|---|
| Over $162,400 | $215,400 .......................................... | 68 percent |
| Over 215,400 | ....................................... | 70 percent |

Consequently, petitioners' taxable income (before claiming the Nitrol loss deductions), for the years in issue, except for Dressler and Overnite, Ltd., was subject to at least a 50-percent tax rate.

1962). Petitioners argue, however, that these losses are not indicative of a lack of profit motive but are attributable to unforeseen events. Specifically, petitioners cite the severe winter of 1977–78 and the shortage of owner-operators to pull petitioners' trailers.

Although we agree with petitioners that the severe winter of 1977–78 partially contributed to the substantial losses sustained in 1977 and 1978, petitioners offered no evidence suggesting that the weather affected trailer operation in subsequent years. Moreover, we find petitioners' emphasis on their inability to locate owner-operators unpersuasive because petitioners' Nitrol trailers continued to sustain substantial losses following petitioners' 1979 purchase of tractors to pull the trailers.

Petitioners also argue that notwithstanding the history of losses, the business-like operation of the Nitrol Program and the subsequent capital contributions to TMC and Road West indicate a strong intent to make a profit. Although we agree that the Nitrol Program was operated in a business-like manner and that petitioners exhibited some commitment to the investment, this evidence, alone, is insufficient to establish the requisite profit motive. See *Carter v. Commissioner*, 645 F.2d 784, 786 (9th Cir. 1981), affg. a Memorandum Opinion of this Court; *Bolt v. Commissioner*, 50 T.C. 1007, 1013 (1968).

The Nitrol Program was marketed on the basis that each trailer would generate sufficient income to pay all operating expenses and to amortize the nonrecourse notes. TMC's business-like operation, therefore, was necessary if it intended to satisfy petitioners' creditors on a regular basis and avoid foreclosure to protect petitioners' future and previously claimed tax benefits.

Similarly, petitioners' commitment to the investment was consistent with petitioners' desire to avoid foreclosure and protect future and previously claimed tax benefits. Petitioners testified at trial that they were aware that the disposition of the trailers would result in tax consequences. The private placement memorandum relied on by petitioners described these tax consequences in detail. Consequently, since each petitioner received, on the average, tax benefits equal to approximately 200 percent of the total cash he invested in the Nitrol Program, including capital contributions to TMC and

Road West,[7] we believe petitioners agreed with Puckett's conclusion contained in his letter to petitioners dated September 9, 1978, that the potential tax consequences made it "prudent to consider making a reasonable capital advance."

Petitioners also contend that their financial status is indicative of a bonafide profit motive. We disagree. Section 1.183–2(b)(8) provides in pertinent part as follows:

Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit * * *

Petitioners' income tax returns for 1977 through 1982 establish that petitioners earned sufficient income from sources other than the Nitrol Program to take substantial advantage of the tax benefits the investment generated. Petitioners' financial status is, therefore, under the circumstances herein, further evidence of petitioners' lack of a profit motive.

In conclusion, after a careful review of all the facts and circumstances, we hold that petitioners' Nitrol Program activities were "not engaged in for profit" within the meaning of section 183(a). Accordingly, respondent's determination is sustained.

To reflect the foregoing,

> *Decisions will be entered under Rule 155 in docket Nos. 22131–81, 22639–81 (Nitrol Issues), 28537–81, and 3114–83.*
> *Decisions will be entered for the respondent in docket Nos. 13350–82 and 18891–82.*

---

[7]

| Petitioners | Loss claimed from Nitrol investment | Investment credit claimed from Nitrol investment | Tax savings at 50% tax rate | Total amount invested |
|---|---|---|---|---|
| Sutton | $284,710 | $27,500 | $169,855.00 | $86,911.83 |
| Knowlton | 271,951 | 27,500 | 163,475.50 | 124,375.01 |
| Fleece | 566,030 | 55,000 | 338,015.00 | 204,295.57 |
| Pruitt | 640,536 | 55,000 | 375,268.00 | 132,556.97 |
| Babcock | 293,199 | 27,500 | 174,099.50 | 73,043.56 |
| Overnite, Ltd. | 244,596 | 27,500 | 149,798.00 | 43,920.00 |
| | | | 1,370,511.00 | 665,102.94 |