JOSEPH SPEAR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Spear v. Commissioner
Docket Nos. 19393-92, 19677-92
United States Tax Court
T.C. Memo 1994-354; 1994 Tax Ct. Memo LEXIS 350; 68 T.C.M. (CCH) 238; July 26, 1994, Filed *350 Decisions will be entered for respondent. For petitioner: Mark Segal. For respondent: Paul K. Voelker. COUVILLION
COUVILLION
MEMORANDUM OPINION COUVILLION, Special Trial Judge: These consolidated cases were heard pursuant to section 7443A(b)(3) [1] and Rules 180, 181, and 182. Respondent determined, for petitioner's 1989 and 1990 tax years, respectively, deficiencies in Federal income taxes of $ 2,418 and $ 4,823, and penalties under section 6662(a), for negligence or disregard of rules or regulations under section 6662(b)(1), of $ 483.60 and $ 964.60. The issues for decision are: (1) Whether a car drag racing activity of petitioner's was an activity not engaged in for profit under section 183, and, (2) if the activity was not engaged in for profit, whether petitioner is liable for the penalties under section 6662(a). Some *351 of the facts were stipulated, and those facts, with the annexed exhibits, are so found and incorporated herein by reference. At the time the petition was filed, petitioner's legal residence was Las Vegas, Nevada. Petitioner's interest in car racing goes back to his childhood, when he attended races with his father and uncles. That interest continued over the years. At trial, petitioner was 46 years of age and was extensively involved in drag racing. Drag racing involves races in which only two cars participate over a straight, quarter-mile course. There are different categories or classifications for drag racing. These classes or categories are determined by the rated speed of the car. For the years in question, petitioner raced in the "super comp" class, which is a shade higher than the "super gas" category. The highest level is the "super eliminator" class, which was the class or category petitioner was racing in at the time of trial. Petitioner began racing cars while he was in high school. After graduation from high school, he attended college for 2 years, majoring in business, then served 3 years in the U.S. Army. The record is not clear to what extent petitioner *352 was involved in car racing, if any, during his college and military careers. Following his discharge from the Army, petitioner commenced employment with a telephone company as an installer and repairman. At trial, he had worked 23 years with this company. His employment was full time, and he frequently worked overtime, including some overtime work during the years at issue. Petitioner first reported his drag racing activity as a trade or business on his 1985 Federal income tax return. For that year and succeeding years, he reported the following income, expenses, and net losses from drag racing: Year
Gross Income
Expenses Gain (Loss) 1985
$   820
$  12,442
($  11,622)
1986
1,800
25,821
(   24,021)
1987
4,000
19,567
(   15,567)
1988
2,300
26,729
(   24,429)
1989
2,500
18,285
(   15,785)
1990
3,700
28,026
(   24,326)
Total,
all years
$ 15,120
$ 130,870
($ 115,750)
No evidence was presented with respect to petitioner's income or losses from his drag racing activity for 1991 and 1992. Petitioner's other income during the above years, which consisted of his wages with the telephone company and nominal income from interest and dividends, was *353 as follows: *1985
$ 31,311 *1986
32,457
1987
22,550
1988
31,142
1989
29,135
1990
38,129
* On the 1985 return, petitioner reported on Schedule 4797,
Gains & Losses From Sales or Exchanges of Assets Used in a Trade
or Business, a loss of $ 5,202 from the sale of parts. On the
1986 return, petitioner reported a $ 1,075 gain from the sale of
assets, which he identified on Schedule 4797 as Trailer
Equipment.
Prior to 1985, the car petitioner used for drag racing was described as a "hobby hot rod". Essentially, this was a regular automobile, equipped with a high performance engine, which was used for street driving and/or racing. Petitioner used this car as his personal means of transportation as well as for racing. For 1985 and thereafter, petitioner used a car that was specially built for racing. The chassis for his 1985 car was built by a specialty firm; petitioner personally mounted and assembled the engine, body, and other accessories. This car was not adaptable for street use and could be used only for racing. The car was transported to race tracks in a van, which petitioner owned, towed by a 1-ton extended cab truck, also owned by petitioner. *354 This was the car petitioner raced during 1989 and 1990. It was rated in the "super comp" class. Following the years at issue, petitioner upgraded his racing car twice, with each car being an upgrade of the previous car. Petitioner's ultimate ambition is to become certified as a "pro stock" racer, although he acknowledged at trial it would be difficult to accomplish that status and at the same time maintain his employment with the telephone company. There are several ways in which earnings can be attained in car racing: (1) By a finishing position in a race; (2) by accumulating points in division and national races; (3) by having a commercial sponsor; (4) by contingency awards; and (5) by carrying advertisements on the equipment used to transport the race car. Most races pay cash to the winner and place finishers of a race. The accumulation of points over a racing season can result in monetary awards by the National Hot Rod Association (NHRA), of which petitioner is a member. Contingency awards may be either in racing parts and supplies or cash, paid by sponsors to winners and place finishers who are using the products of the sponsor provided the winning car and place finisher *355 bear the emblem, decal, or advertising symbol of the sponsor. Of the various means by which racing income can be earned, petitioner, during the years in question, earned cash awards for winning and place finishing in several races. These amounts were reported on his 1989 and 1990 income tax returns. Petitioner has never been successful in having a commercial sponsor, although he has earned parts and supplies from contingency sponsors and has also received parts from a retailer engaged in the racing car business for carrying an advertisement of the retailer on petitioner's van used in transporting petitioner's racing car. No evidence was presented to establish the total value of the parts and supplies petitioner earned from these sources, nor has the value of those items ever been reported by petitioner on his income tax returns. At the time petitioner commenced his racing activity in 1985, he developed a plan in which he set goals by which he would ultimately realize a profit. The plan was not introduced into evidence at trial because petitioner's records, which included the plan, were destroyed in an accident involving the van during 1989. Petitioner presented no specific *356 information about the plan other than his conclusion in the plan was that it would take 10 years for him to realize a profit. Races are classified as either local, division, or national. Occasionally, a race might be scheduled as a special event, which is comparable to the half-time presentation at a sporting event. The division and national races are sanctioned by the NHRA. The NHRA licenses drivers in its sanctioned races. Additionally, for drivers in "super comp" or higher, the driver must pass a physical examination. Petitioner was certified by the NHRA and passed the required physical examination. During 1989, petitioner raced in 14 events, which included 5 division races, 2 national races, 5 local races, and 2 special events. During 1990, he raced in 25 events, which included 6 division races, 4 national races, 13 local races, and 2 special events. The racing season customarily is between February and October. In separate notices of deficiency, respondent disallowed the $ 15,785 and $ 24,334 losses attributable to petitioner's racing activity for 1989 and 1990. [2]
*357 Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed. Section 183(b)(1), however, provides that deductions that are allowable without regard to whether the activity is engaged in for profit shall be allowed, and section 183(b)(2) provides that deductions that would be allowable only if the activity were engaged in for profit shall be allowed, "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of" section 183(b)(1). Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The standard for determining whether the expenses of an activity are deductible under either section 162 or section 212(1) or (2) is whether the taxpayer engaged in the activity with the "actual and honest objective of making a profit". Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), *358 affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all relevant facts and circumstances. Hulter v. Commissioner, supra at 393; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). The burden of proving such objective is on the taxpayer. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In resolving this factual question, greater weight is given to objective facts than to the taxpayer's after-the-fact statements of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Siegel v. Commissioner, 78 T.C. 659, 699 (1982); *359 sec. 1.183-2(a), Income Tax Regs.
Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of 9 objective factors relevant to the determination of whether an activity is engaged in for profit. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. These factors are not merely a counting device where the number of factors for or against the taxpayer is determinative, but rather all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. Cf. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). *360 Not all factors are applicable in every case, and no one factor is controlling. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Allen v. Commissioner, supra at 34; sec. 1.183-2(b), Income Tax Regs.
The Court is satisfied from the evidence that petitioner was dedicated to drag racing and, outside of his employment, was exclusively focused on this activity. All of his time away from his employment, which he estimated at 30 to 40 hours per week, was devoted to racing. This tribute, however, does not resolve the case. There are several factors that lead the Court to conclude that petitioner's activity was not an activity engaged in for profit. First and foremost, the record shows that petitioner did not conduct his activity in a businesslike manner. Although petitioner claimed he kept records, which were destroyed in 1989, it appears to the Court that the records petitioner kept dealt more with schedules of races and the mechanical aspects of petitioner's car than the business and financial aspects of his activity. This is illustrated by respondent's stipulation that, while respondent agreed petitioner had incurred *361 the expenses claimed on his returns for 1989 and 1990 relating to his racing activity, respondent was unwilling to agree that the expenses claimed were properly characterized on the return. This position is underscored, as an example, by legal and professional expenses of $ 1,011 claimed as an expense related to the racing activity on petitioner's 1989 return. At trial, petitioner was unable to explain anything about this expense. Petitioner admitted that, after his records were destroyed in the 1989 accident, he did not thereafter maintain accounting records of his activity. Petitioner maintained only one bank checking account out of which he operated his racing activity. The Court rejects petitioner's contention that he had no personal expenses to pay out of this account. Although petitioner referred to a plan by which he would ultimately realize a profit, the details of that plan were not revealed to the Court, except that petitioner projected it would take 10 years for his activity to become profitable. Petitioner failed to enlighten the Court as to how, in 10 years, his activity would have been profitable. His track record for the first 6 years certainly did not show *362 or establish that he was moving toward profitability. Petitioner placed some emphasis on the fact that, of the three cars he has used in his racing activity since 1985, each car was an upgrade over the prior car. By upgrading his equipment, petitioner argued he could participate in races that would pay larger awards and thus would enhance the possibility of his activity becoming profitable. These upgrades, however, have clearly not attained that result. Petitioner produced no evidence to show any additional action on his part that would have turned the business around, given the fact that he was eligible to participate in races offering higher awards. From 1985 through 1990, petitioner's losses appeared to increase rather than decrease. Petitioner stressed the fact that he continuously talked with others engaged in racing to learn more about the activity. It is evident to the Court that these discussions dealt more with the mechanical aspects of racing rather than the business aspect. Petitioner was not organized with a professional staff. His "racing crew" consisted of friends who occasionally went along with him on races. However, on many occasions, some crew members did *363 not accompany him because of the distance and expense involved. The absence of a regular, consistent crew indicates that the activity was not conducted on a professional level. At trial, petitioner contended that the value of his racing assets had appreciated in value, thus satisfying one of the requisites of section 1.183-2(b), Income Tax Regs. Although there was no credible evidence presented to establish this contention other than petitioner's testimony, even if petitioner's assets appreciated in value, it is evident to the Court that the increased value is not attributable to petitioner's success in racing. The appreciation in value is more likely attributable to the value of petitioner's labor on the assets. This Court has held that, when the property's appreciation in value is independent of the claimed business activity, the gain realized from sale of the property is not taken into account in evaluating the profits and losses of the activity in question. See Wright v. Commissioner, T.C. Memo. 1990-630; Ruben v. Commissioner, T.C. Memo. 1986-260. Petitioner admitted that his ultimate goal to become a professional *364 racer would have been stymied by his existing employment with the telephone company. Petitioner's livelihood depended on his job with the telephone company. Finally, not to be overlooked is the fact that petitioner was dedicated to car racing as a sport, and his love for that activity completely overshadowed the business aspects. The elements of personal pleasure and recreation dominated all semblances of profit. On this record, the Court holds that petitioner's drag racing activity was not an activity engaged in for profit under section 183. Respondent, therefore, is sustained on this issue. Respondent determined that petitioner is liable for the penalty for the 2 years in question under section 6662(a) for negligence or disregard of rules or regulations under section 6662(b)(1). Section 6662(a) provides that, if it is applicable to any portion of an underpayment in taxes, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which section 6662 applies. Section 6662(b)(1) provides that section 6662 shall apply to any underpayment attributable to negligence or disregard of rules or regulations. Section 6662(c) provides that the *365 term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations. It is well established that the taxpayer bears the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757 (1972). Petitioner has not sustained his burden on this issue. Over a period of 6 years, he claimed losses aggregating $ 115,750 with no apparent hope or expectation that the activity would ever become profitable. He was engaged in an activity that dated back to his childhood, and his interest in this activity was predominantly for pleasure and recreation. Petitioner should have known that his activity did not rise to the level of an activity engaged in for profit. Additionally, petitioner earned awards of value from contingency sponsors, which he did not report as income. On this record, respondent is sustained on this issue. Decisions will be entered for respondent.
Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The loss on Schedule C of petitioner's 1990 income tax return is $ 24,326; however, the adjustment in the notice of deficiency is $ 24,334. The schedule in the notice of deficiency explaining the adjustment refers to the $ 8 difference as a "corrected amount". At trial, petitioner did not challenge the $ 8 correction determined by respondent.↩