T.C. Summary Opinion 2005-86


UNITED STATES TAX COURT


JOHN E. AND VICKI D. MORRISSEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5073-04S.                    Filed July 13, 2005.


John E. and Vicki D. Morrissey, pro sese.

<u>Douglas S. Polsky</u>, for respondent.


KROUPA, <u>Judge</u>:  This case was heard pursuant to the provisions of section 7463[1] of the Internal Revenue Code in effect at the time the petition was filed.  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

--------

[1]All section references are to the Internal Revenue Code in effect for the years at issue, unless otherwise indicated.

Respondent determined deficiencies of $6,225 for 1999, $6,687 for 2000, and $5,866 for 2001 in petitioners' Federal income taxes. The issue to be decided is whether petitioner John E. Morrissey (petitioner) operated his automobile drag racing activity for profit during 1999, 2000, and 2001 (the years at issue). We hold that he did.

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioners resided in Wetmore, Kansas, at the time they filed the petition in this case.

Petitioner has been interested in cars throughout his life and has been involved from time to time in some type of automobile racing since 1969.

Petitioner graduated from Emporia State University in 1970 with a degree in business administration. His studies included courses in marketing and mathematics. During the years at issue, petitioner was the senior vice president and chief financial officer of Kansas State Bank of Holton, Kansas (the bank), a full-time position.[2] He earned a salary of approximately $58,000 during each of the years at issue. Petitioner also served on the board of directors of the bank. Petitioner oversaw the bank's financial planning, budgeting, and statistical analysis

---

[2]Petitioner Vicki D. Morrissey was also employed full time at the Wetmore, Kansas, branch of the bank during the years at issue.

functions.  Petitioner also served on the loan committee and designed the review mechanism by which the members of the bank's loan committee assessed loan applicants.

Petitioner believed that his business degree and technical skills could be an advantage to him in drag racing.  Petitioner began competing about 1974, beginning with a relatively simple car and then moving up.  Petitioner applied his extensive knowledge of mechanics, mathematics, and physics to make important technical modifications to his car.  For example, petitioner installed electronic equipment intended to fine-tune the car's reaction time.  Petitioner is a skilled mechanic and was able to perform almost all of the work on his car himself.

Petitioner also kept detailed computer records of his car's performance during each race, including weather conditions, heat times, and records of opponents' performances.  Petitioner thought these records would help him identify the ideal attributes of his car to enable him to win races.  Petitioner also often spoke to other competitors and assessed their strategies.  Petitioner also examined less successful competitors in an attempt to determine why those competitors were not successful.  Petitioner began winning rounds of competition in 1991 and races in 1993.

Petitioner carefully organized his racing schedule to compete in races where he had the greatest chance of success. During the years at issue, petitioner raced mainly at unsanctioned or "outlaw" racetracks, which had lower entry fees

and typically more prize money.  Although the National Hot Rod Association (NHRA) licensed petitioner in the Super Comp category, petitioner viewed NHRA-sanctioned events merely as opportunities to gain exposure for his sponsor.  The entry fees at NHRA-sanctioned events were higher, the prizes were not as large, and there were many more competitors.

Petitioner prepared detailed budget forecasts and expense estimates for his racing activity for the years at issue, which he modified throughout each year as circumstances changed. Petitioner also kept a separate checking account for his racing activity.

Petitioner entered eight drag races in 1999, eight drag races in 2000, and six drag races in 2001.  Petitioner's son also raced petitioner's car at some races during the years at issue. Although the bank employed petitioner full time during the years at issue, petitioner was able to take the time to attend to the necessary aspects of his racing, such as repairing his car, contacting sponsors, and participating in races.  The amount of time these activities took varied according to, for example, the amount of repairs needed after a race.  Petitioner's wife and son also assisted petitioner with these activities on occasion.

Petitioner believed that he owned a quality car and used quality parts in its maintenance.  Petitioner hoped that his car would hold its value as much as possible but did not expect that

his car would appreciate in value.  Petitioner instead focused on keeping his car in as good a condition as possible so that it would retain most of its value.

Petitioner knew that a substantial sponsor was essential to be profitable in drag racing.  While some sponsors pay small sums of money to racers to display the sponsors' logos on their cars, petitioner was instead interested in cultivating a mutually beneficial relationship with a sponsor on a larger scale. Petitioner successfully secured sponsorship in 1998 by the Sac and Fox Casino (Sac and Fox) of $15,000 for the year.  In connection with the sponsorship, petitioner purchased a new body for his car and painted Sac and Fox's logo on the car.

Petitioner performed various duties for Sac and Fox, including acting as a representative of Sac and Fox at races, car shows, and various other public appearances.  Petitioner met patrons and handed out coupons, flyers, and key chains for Sac and Fox at several public appearances.  Petitioner also coordinated with the Cameron, Missouri, reserve track to sponsor a race, adding $500 to the purse.  Petitioner promoted this race as the Sac and Fox Casino Quick Eight Race.  At the end of the year, petitioner provided Sac and Fox a detailed race report listing each of the events petitioner attended as a representative of Sac and Fox, with notations about each event. This report indicates petitioner undertook some activity on behalf of Sac and Fox on 31 days during 1998.  Despite petitioner's efforts on behalf of Sac and Fox in 1998, Sac and

Fox did not renew petitioner's sponsorship for 1999 nor any later year. Petitioner expected this sponsorship relationship to continue and did not foresee the termination of Sac and Fox's marketing director, who was his primary contact at Sac and Fox.

Petitioner tried to get another sponsorship. Petitioner contacted Sac and Fox and two other local casinos seeking sponsorship but was ultimately unsuccessful. Petitioner continued to race in 1999 despite lacking a sponsor.

Petitioner determined in 2000 that he could not profitably continue the drag racing operations without sponsorship and therefore limited his racing activity and offered his car for sale, intending to liquidate. Much of petitioner's racing activity during 2000 and 2001 was intended to market his car to sell it. Petitioner also offered his car for sale in the National Dragster Magazine in 2001.

While there were some elements of personal enjoyment in the drag racing activity, petitioner also indicated there were aspects to it that he did not enjoy, including the significant heat on the track and the multiple layers of protective clothing required.

Petitioner's drag racing activity produced a loss for each year from 1991 through 1997. In 1998, petitioner earned a profit of $587 on gross receipts of $1,400 plus the $15,000 sponsorship. Petitioner forecasted a profit of $13,040 for 1999 assuming the Sac and Fox sponsorship would continue and assuming $5,000 of race winnings. Petitioner had gross receipts of $550 and a net

loss of $20,348 in 1999, gross receipts of $225 and a net loss of $22,197 in 2000, and gross receipts of $25 and a net loss of $18,826 in 2001.

Petitioners deducted expenses relating to the drag racing activity on their tax returns for the years at issue. Respondent disallowed the deduction of petitioner's losses in a notice of deficiency dated February 5, 2004, determining that petitioner did not engage in the drag racing activity for profit under section 183. Petitioners timely filed a petition with this Court seeking redetermination of the disallowed deductions and asserting that petitioner entered the drag racing activity with the intent of making a profit, and that, when he was not able to make a profit as anticipated, he liquidated the activity.

## Discussion

### A. Whether Petitioner Operated the Drag Racing Activity for Profit During the Years at Issue

The sole issue for decision is whether petitioner operated the drag racing activity for profit during the years at issue within the meaning of section 183. Section 183(a) provides generally that if an individual engages in an activity and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Deductions that would be allowable without regard to whether the activity is engaged in for profit shall be allowed under section 183(b)(1), and deductions that would be allowable only if the activity is

engaged in for profit shall be allowed under section 183(b)(2), but only to the extent that the gross income from the activity exceeds the deductions allowable under section 183(b)(1).

Petitioner has the burden of proving that his actual and honest objective in engaging in the activity was to make a profit. See Evans v. Commissioner, 908 F.2d 369, 373 (8th Cir. 1990), revg. T.C. Memo. 1988-468; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983).

We begin with the burden of proof. We ruled at trial that the burden of proof did not shift to respondent under section 7491[3] because petitioner failed to provide respondent the general ledgers he maintained during the years at issue as well as his tax returns for the years prior and subsequent to the years at issue. Therefore, the burden remains with petitioner.

We now focus on whether petitioner had an actual and honest profit objective in drag racing. Whether a taxpayer has an actual and honest profit objective is determined on the basis of all surrounding facts and circumstances. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(b), Income Tax Regs. While a taxpayer's expectation of profit need not be reasonable, there must be a good faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); sec. 1.183-2(a), Income

---

[3]Sec. 7491 applies to examinations commencing after July 22, 1998, and therefore applies here. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726.

Tax Regs. We give greater weight to objective facts than to a taxpayer's statements of intent. Dreicer v. Commissioner, supra at 645; sec. 1.183-2(a), Income Tax Regs.

We structure our analysis around nine nonexclusive factors. Sec. 1.183-2(b), Income Tax Regs. The nine factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Id.

No factor or set of factors is controlling, nor is the existence of a majority of factors favoring or disfavoring a profit objective necessarily controlling. Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), affg. T.C. Memo. 1993-396; Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); sec. 1.183-2(b), Income Tax Regs. The individual facts and circumstances of each case are the primary test. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); Allen v. Commissioner, supra at 34; sec. 1.183-2(b), Income Tax Regs.

B.    Application of the Factors

    1.    The Manner in Which the Taxpayer Carried On the Activity

We begin by examining the manner in which petitioner carried on the drag racing activity. The fact that a taxpayer carries on the activity in a businesslike manner may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. In determining whether a taxpayer conducted an activity in a businesslike manner, we consider whether the taxpayer maintained complete and accurate books and records, whether the activity was conducted in a manner substantially similar to those of comparable businesses that are profitable, and whether changes were attempted in an effort to earn a profit. Engdahl v. Commissioner, 72 T.C. 659, 666-667 (1979); sec. 1.183-2(b)(1), Income Tax Regs.

Petitioner conducted the drag racing activity in a businesslike manner during the years at issue. Petitioner kept a separate checking account for the drag racing activity, out of which he paid his expenses and into which he deposited his earnings. Petitioner also prepared budget forecasts and expense estimates for each of the years at issue and modified these projections throughout the year as circumstances changed.

Petitioner had a specific, concrete business plan to profit from drag racing, the details of which he explained to the Court in his testimony. Cf. Spear v. Commissioner, T.C. Memo. 1994-354 (taxpayer alluded in testimony to a plan to realize profit but did not provide details). Petitioner's business plan called for him to obtain substantial sponsorships, to enter NHRA-sanctioned

races as a means of gaining exposure for his sponsor, and otherwise to enter unsanctioned races where he had the best chance of success and the opportunity to win larger prizes. Petitioner was successful in making a profit as predicted in the business plan during 1998.  Petitioner was not able to earn a profit as predicted in the business plan, however, during the years at issue, largely because he had lost his sponsorship and was unsuccessful in persuading other local businesses to sponsor him.

When petitioner realized that he was not able to earn a profit on the drag racing activity as predicted in his business plan, he decided to liquidate his business and sell his race car. See Engdahl v. Commissioner, supra at 667; Canale v. Commissioner, T.C. Memo. 1989-619 (taxpayer's decision to leave racing because of its unprofitability supported claim of entering racing with a profit objective).  During the years at issue, petitioner decreased the number of races he entered and testified he entered them mainly to market his car.  The separate checking account, specific business plan, budget and expense forecasts, and decision to modify the activity when it became unprofitable support petitioner's contention that he carried on the drag racing activity in a businesslike manner during the years at issue.

2.  The Expertise of the Taxpayers or Their Advisers

We next consider petitioner's expertise (or the expertise of his advisers) in the drag racing activity.  Preparing for the

activity by extensive study of its accepted business, economic and scientific practices and consulting with experts in these matters may indicate that a taxpayer has a profit objective when the taxpayer follows that advice. Sec. 1.183-2(b)(2), Income Tax Regs.

There is no question that petitioner has significant expertise in drag racing. Petitioner has been involved in drag racing since 1969 and began winning rounds of competition in 1991. Petitioner is a skilled mechanic and was able to perform most of the required work on his car himself. Petitioner studied the performances of his car and his opponents' cars (and kept records of these performances) to determine the ideal characteristics for his car. Petitioner also often consulted with competitors to learn about their tactics and strategies.

Petitioner also has considerable business knowledge. He was the senior vice president and chief financial officer of the bank during the years at issue. While pursuing his degree in business administration, petitioner took courses in marketing and mathematics. These skills proved valuable to petitioner in creating business plans and budget forecasts and doing the necessary marketing to obtain a sponsor.

Petitioner has demonstrated that he has significant knowledge and expertise both in drag racing itself and in the business world. Petitioner has also shown that he consulted others to further his knowledge and improve his prospects of success.

3.    The Time and Effort Expended by the Taxpayer in Carrying On the Activity

We next consider the time and effort petitioner expended in carrying on the drag racing activity.  A taxpayer's devotion of much time and effort to conducting an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit.  Sec. 1.183-2(b)(3), Income Tax Regs.  The fact that a taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on the activity.  Id.

Petitioner expended an adequate amount of time on the drag racing activity during the years at issue.  Petitioner competed in eight races in 1999 and 2000 and six races in 2001.  When petitioner was unable to race, petitioner's son raced petitioner's car.  Petitioner testified that he limited the number of races in which he competed because he did not have sponsorship and was trying to minimize costs.  Petitioner's report to Sac and Fox for 1998, however, indicates he undertook some activity on behalf of Sac and Fox on 31 days during that year.  See Canale v. Commissioner, supra (taxpayer decreased the number of races entered after the taxpayer decided to leave racing but had devoted substantial time to racing in previous years).  Petitioner introduced no evidence regarding the number of hours per week he spent on drag racing but indicated it varied, depending on, for example, the level of repairs needed after a race.  Petitioner's schedule, although full-time, was

flexible enough to permit him to devote time to his racing as needed. Petitioner's wife and son also assisted petitioner in doing the required work.

4. The Expectation That the Assets Used in the Activity May Appreciate in Value

We next examine the expectation that the assets used in petitioner's drag racing activity may appreciate in value. A taxpayer may intend, despite the lack of profit from current operations, that an overall profit will result when appreciation in the value of assets used in the activity is realized. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs.

Although petitioner believed he had a quality car and used quality parts in his car, he did not expect the assets he used in the drag racing activity to appreciate in value. Petitioner concentrated on maintaining his car in as good a condition as possible to minimize repair and upgrade costs, not because he thought that doing so would cause the value of the car to increase.

5. The Success of the Taxpayer in Carrying On Other Similar or Dissimilar Activities

We next examine petitioner's success in carrying on other similar or dissimilar activities. If a taxpayer has previously engaged in similar activities and made them profitable, this success may show that the taxpayer has a profit objective, even though the current activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. A taxpayer's success in other,

unrelated activities also may indicate a profit objective.
Daugherty v. Commissioner, T.C. Memo. 1983-188.  A taxpayer who
was able to start a business and turn it into a relatively large
and profitable enterprise through the taxpayer's diligence,
initiative, foresight, and other qualities that generally lead to
success in other business activities has shown evidence of a
profit objective.  Id.

Petitioner is an experienced businessman.  During the years
at issue, petitioner was the senior vice president and chief
financial officer of the bank.  Petitioner's activities in his
position included serving on the loan committee, which required
petitioner to assess the needs and attributes of businesses
applying for loans and to oversee the bank's financial planning,
budgeting, and statistical analysis functions.  Petitioner also
served on the board of directors of the bank, helping to make
important business decisions and oversee the bank's direction.
Petitioner's success in the banking field indicates that he has
considerable business skills.  See id.

6.  The Taxpayer's History of Income or Loss With Respect
to the Activity

We next examine petitioner's history of income or loss with
respect to the activity.  A history of substantial losses may
indicate that the taxpayer did not conduct the activity for
profit.  Golanty v. Commissioner, 72 T.C. 411, 427 (1979), affd.
without published opinion 647 F.2d 170 (9th Cir. 1981); sec.
1.183-2(b)(6), Income Tax Regs.  Losses during the initial or
startup stage of an activity do not necessarily indicate,

however, that the taxpayer did not conduct the activity for profit, but losses that continue to be sustained beyond the period that customarily is necessary to bring the operation to profitable status may indicate the taxpayer did not engage in the activity for profit. Engdahl v. Commissioner, 72 T.C. at 668; sec. 1.183-2(b)(6), Income Tax Regs. Losses due to unforeseen circumstances beyond the taxpayer's control do not indicate that the taxpayer did not engage in the activity for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Abandoning an activity after indications that the activity will be unprofitable signifies that the taxpayer engaged in the activity for profit. Canale v. Commissioner, T.C. Memo. 1989-619.

Petitioner sustained losses from the drag racing activity each year from 1991 to 1997 while he was beginning and developing the drag racing activity. During 1998, petitioner successfully attracted a sponsor and earned a profit, albeit small. Petitioner testified that during 1998 he also incurred some one-time expenses related to the sponsorship, such as painting the sponsor's logo on his car. Petitioner sustained further losses during the years at issue, but these losses were due first to the unforeseen event of his contact at Sac and Fox being terminated that led to his losing his sponsorship and next to the winding up and liquidation of his business. Petitioner attempted to minimize his losses during the years at issue by cutting costs and entering fewer races.

7. <u>The Amount of Occasional Profits, If Any, Which Are Earned</u>

We next consider the amounts of occasional profits, if any, petitioner earned. Occasional profits the taxpayer earned from the activity, in relation to the amount of losses incurred, the amount of the taxpayer's investment, and the value of the assets used in the activity provide useful criteria in determining the taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. A practical possibility that a taxpayer could earn enough money in a year to exceed expenses also can indicate a profit objective. <u>Bolt v. Commissioner</u>, 50 T.C. 1007, 1014 (1968).

Petitioner obtained a substantial sponsorship in 1998 and expected the sponsorship to continue during the years at issue. Petitioner incurred one-time costs related to the sponsorship in 1998, such as painting the sponsor's logo on his car, but did make a small profit during that year.

Respondent contends that petitioner would have had a net loss even with a $15,000 sponsorship during the years at issue. We do not give respondent's hypothetical situation great weight. Petitioner organized his affairs during the years at issue around the reality that he did not have a sponsor. If petitioner had had a sponsor during the years at issue, his income and expenses might have been considerably different. Petitioner might have competed in more races (incurring more entry fees but also creating more opportunities to win prize money) to gain more exposure for his sponsor. In fact, petitioner's 1999 budget projection with a $15,000 sponsorship and $5,000 race winnings

anticipated a profit of $13,040 for 1999. Petitioner also decided to liquidate in 2000 and therefore minimized costs and entered fewer races. Petitioner has shown that he could earn enough money in a year to cover his expenses; he accomplished that in 1998.

8. <u>The Financial Status of the Taxpayer</u>

We next examine petitioner's financial status. If a taxpayer does not have substantial income or capital from sources other than the activity in question, it may indicate that the taxpayer engages in the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs. Conversely, substantial income from sources other than the activity, especially if the losses generate large tax benefits, may indicate that the taxpayer is not conducting the activity for profit. <u>Id.</u> Those with substantial income from other sources have a much greater tax incentive to incur large expenditures in a hobby type of business. <u>Jackson v. Commissioner</u>, 59 T.C. 312, 317 (1972).

During the years at issue, petitioners' financial status was stable. Petitioner earned a good salary from the bank but not in six figures. Both petitioners used some of their income from their full-time jobs at the bank to help support the drag racing activity during the startup phase. While petitioners' financial status was stable, their income was not so substantial that it would indicate a great tax incentive to incur large losses from the drag racing activity.

9. **Whether Elements of Personal Pleasure or Recreation Are Involved**

We next examine whether elements of personal pleasure or recreation were involved in the activity. The presence of recreational or pleasurable motives in conducting an activity may indicate that the taxpayer is not conducting the activity for profit. Sec. 1.183-2(b)(9), Income Tax Regs. The fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit, however, if the activity is, in fact, conducted for profit as shown by other factors. Jackson v. Commissioner, supra; sec. 1.183-2(b)(9), Income Tax Regs.

Petitioner has been interested in cars throughout his life and obviously enjoys drag racing. Petitioner also testified, however, that there were aspects of the activity that he did not enjoy, including the heat on the track and the multiple layers of protective clothing he was required to wear. Petitioner further emphasized that, when he was unable to produce a profit from the activity, he stopped the activity. He testified that he did not enjoy it enough to continue without the possibility of financial gain. Although petitioner may have derived some pleasure from the drag racing activity, this factor does not outweigh the other factors indicating that petitioner engaged in the drag racing activity for profit.

10. **Conclusion**

Considering all of the facts and circumstances of this case, we find that petitioner has proved that he engaged in the drag

racing activity with the actual and honest intent to earn a profit.  Accordingly, we do not sustain respondent's determination in the statutory notice of deficiency.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.